## Robert G. Dalury and Karen L. Dalury v. S-K-I, Ltd., and Killington, Ltd.

[670 A.2d 795]

No. 94-236

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 8, 1995

Motion for Reargument Denied October 31, 1995

*James W. Swift* and *Beth Robinson* of *Langrock Sperry & Wool,* Middlebury, for Plaintiffs-Appellants.

*Allan R. Keyes* and *John J. Zawistoski* of *Ryan Smith & Carbine, Ltd.,* Rutland, for Defendants-Appellees.

■ **Johnson, J.** We reverse the trial court's grant of summary judgment for defendants S-K-I, Ltd. and Killington, Ltd. in a case involving an injury to a skier at a resort operated by defendants. We hold that the exculpatory agreements which defendants require skiers to sign, releasing defendants from all liability resulting from negligence, are void as contrary to public policy.

While skiing at Killington Ski Area, plaintiff Robert Dalury sustained serious injuries when he collided with a metal pole that formed part of the control maze for a ski lift line. Before the season started, Dalury had purchased a midweek season pass and signed a form releasing the ski area from liability. The relevant portion reads:

RELEASE FROM LIABILITY AND CONDITIONS OF USE

1. I accept and understand that Alpine Skiing is a hazardous sport with many dangers and risks and that injuries are a common and ordinary occurrence of the sport. As a condition of being permitted to use the ski area premises, I freely accept and voluntarily assume the risks of injury or property damage and release Killington Ltd., its employees and agents from any and all liability for personal injury or property damage resulting from negligence, conditions of the premises, operations of the ski area, actions or omissions of employees or agents of the ski area or from my participation in skiing at the area, accepting myself the full responsibility for any and all such damage or injury of any kind which may result.

Plaintiff also signed a photo identification card that contained this same language.

Dalury and his wife filed a complaint against defendants, alleging negligent design, construction, and replacement of the maze pole. Defendants moved for summary judgment, arguing that the release of liability barred the negligence action. The trial court, without specifically addressing plaintiffs' contention that the release was contrary to public policy, found that the language of the release clearly absolved defendants of liability for their own negligence.

The trial court based its decision on *Douglass v. Skiing Standards, Inc.*, 142 Vt. 634, 637, 459 A.2d 97, 99 (1983), in which we held that an exculpatory agreement was sufficient to bar a negligence action by a professional freestyle skier who was injured in a skiing competition, and two subsequent decisions of the United States District Court for

the District of Vermont. See *Estate of Geller v. Mount Snow Ltd.*, No. 89-66, slip op. at 5-6 (D. Vt. May 21, 1991) (summary judgment granted where plaintiff recreational skier signed release on back of ski pass); *Barenthein v. Killington Ltd.*, No. 86-33, slip op. at 7 (D. Vt. June 17, 1987) (summary judgment granted where plaintiff signed equipment rental agreement which contained a release). The trial court did not view the distinction between professional and recreational skiing as significant, and granted summary judgment on the ground that the release was clear and unambiguous.

On appeal, plaintiffs contend that the release was ambiguous as to whose liability was waived and that it is unenforceable as a matter of law because it violates public policy. We agree with defendants that the release was quite clear in its terms. Because we hold the agreement is unenforceable, we proceed to a discussion of the public policy that supports our holding.

## I.

This is a case of first impression in Vermont.[1] While we have recognized the existence of a public policy exception to the validity of exculpatory agreements, see *Lamoille Grain Co. v. St. Johnsbury & L.C.R.R.*, 135 Vt. 5, 7, 369 A.2d 1389, 1390 (1976) (public policy forbids a railroad from limiting its duty of care to the public, but this rule does not extend to the railroad's private contractual undertakings), in most of our cases, enforceability has turned on whether the language of the agreement was sufficiently clear to reflect the parties' intent. See *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 437-38, 658 A.2d 31, 33-34 (1995) (lease clearly contemplated landlord's purchase of fire insurance, releasing tenant from liability for negligence); *Colgan v. Agway, Inc.*, 150 Vt. 373, 376-78, 553 A.2d 143, 146 (1988) (broad exculpatory language at end of limited warranty clause insufficient to release defendant for negligent design); *Douglass*, 142 Vt. at 637, 459 A.2d at 99 (agreement in entirety sufficiently clear to show experienced, professional freestyle skier intended to hold ski area harmless); *Lamoille Grain Co.*, 135 Vt. at 8, 369 A.2d at 1390 (language of contract sufficiently clear to show parties' intent to hold railroad harmless for its own negligence).

---

[1] Contrary to defendants' implication, we did not decide this issue in *Douglass*. That decision upheld a release signed by a participant in a freestyle skiing competition that was challenged on the basis of the clarity of the language. *Douglass*, 142 Vt. at 637, 459 A.2d at 99. Whether the release violated public policy was neither raised nor decided in that case. We do not address here whether such exculpatory agreements are void as contrary to public policy.

■ Even well-drafted exculpatory agreements, however, may be void because they violate public policy. Restatement (Second) of Torts § 496B comment e (1965). According to the Restatement, an exculpatory agreement should be upheld if it is (1) freely and fairly made, (2) between parties who are in an equal bargaining position, and (3) there is no social interest with which it interferes. § 496B comment b. The critical issue here concerns the social interests that are affected.

Courts and commentators have struggled to develop a useful formula for analyzing the public policy issue. The formula has been the "subject of great debate" during "the whole course of the common law," and it had proven impossible to articulate a precise definition because the "social forces that have led to such characterization are volatile and dynamic." *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 444 (Cal. 1963).

The leading judicial formula for determining whether an exculpatory agreement violates public policy was set forth by Justice Tobriner of the California Supreme Court. *Id.* at 444-46. An agreement is invalid if it exhibits some or all of the following characteristics:

> [1.] It concerns a business of a type generally thought suitable for public regulation. [2.] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3.] The party holds [it]self out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4.] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks [the party's] services. [5.] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6.] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or [the seller's] agents.

*Id.* at 445-46 (footnotes omitted). Applying these factors, the court concluded that a release from liability for future negligence imposed

as a condition for admission to a charitable research hospital was invalid. *Id.* at 449. Numerous courts have adopted and applied the *Tunkl* factors. See *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 758 P.2d 968, 971-73 (Wash. 1988) (release for school district's interscholastic athletics violated public policy); *Kyriazis v. University of W. Va.*, 450 S.E.2d 649, 654-55 (W. Va. 1994) (release for state university-sponsored club rugby was invalid because "[w]hen a state university provides recreational activities to its students, it fulfills its educational mission, and performs a public service").

Other courts have incorporated the *Tunkl* factors into their decisions. The Colorado Supreme Court has developed a four-part inquiry to analyze the validity of exculpatory agreements: (1) existence of a duty to the public, (2) the nature of the service performed, (3) whether the contract was fairly entered into, and (4) whether the intention of the parties is expressed in clear and unambiguous language. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). In the *Jones* case, the court concluded, based on the *Tunkl* factors, that no duty to the public was involved in air service for a parachute jump, because that sort of service does not affect the public interest. *Id.* at 376-77. Using a similar formula, the Wyoming Supreme Court concluded that a ski resort's sponsorship of an Ironman Decathlon competition did not invoke the public interest. *Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1066-67 (Wyo. 1988).

On the other hand, the Virginia Supreme Court recently concluded, in the context of a "Teflon Man Triathlon" competition, that a preinjury release from liability for negligence is void as against public policy because it is simply wrong to put one party to a contract at the mercy of the other's negligence. *Hiett v. Lake Barcroft Community Ass'n*, 418 S.E.2d 894, 897 (Va. 1992). The court stated: "'[T]o hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct . . . can never be lawfully done where an enlightened system of jurisprudence prevails. Public policy forbids it, and contracts against public policy are void.'" *Id.* at 896 (quoting *Johnson's Adm'x v. Richmond & Danville R.R.*, 11 S.E. 829, 829 (Va. 1890)).

Having reviewed these various formulations of the public policy exception, we accept them as relevant considerations, but not as rigid factors that, if met, preclude further analysis. Instead, we recognize that no single formula will reach the relevant public policy issues in every factual context. Like the court in *Wolf v. Ford*, 644 A.2d 522, 527 (Md. 1994), we conclude that ultimately the "determination of what

constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations."

## II.

Defendants urge us to uphold the exculpatory agreement on the ground that ski resorts do not provide an essential public service. They argue that they owe no duty to plaintiff to permit him to use their private lands for skiing, and that the terms and conditions of entry ought to be left entirely within their control. Because skiing, like other recreational sports, is not a necessity of life, defendants contend that the sale of a lift ticket is a purely private matter, implicating no public interest. See, e.g., *Milligan*, 754 P.2d at 1066 ("Generally, a private recreational business does not qualify as a service *demanding* a special duty to the public, nor are its services of a special, highly necessary or essential nature."). We disagree.

■ Whether or not defendants provide an essential public service does not resolve the public policy question in the recreational sports context. The defendants' area is a facility open to the public. They advertise and invite skiers and nonskiers of every level of skiing ability to their premises for the price of a ticket. At oral argument, defendants conceded that thousands of people buy lift tickets every day throughout the season. Thousands of people ride lifts, buy services, and ski the trails. Each ticket sale may be, for some purposes, a purely private transaction. But when a substantial number of such sales take place as a result of the seller's general invitation to the public to utilize the facilities and services in question, a legitimate public interest arises.

The major public policy implications are those underlying the law of premises liability. In Vermont, a business owner has a duty "of active care to make sure that its premises are in safe and suitable condition for its customers." *Debus v. Grand Union Stores*, 159 Vt. 537, 546, 621 A.2d 1288, 1294 (1993). We have recognized this duty of care where the defendant's routine business practice creates a foreseeable hazard for its customers. *Id.*; see also *Forcier v. Grand Union Stores, Inc.*, 128 Vt. 389, 394, 264 A.2d 796, 799 (1970) (self-service fruit and vegetable display created foreseeable hazard to business invitees). The business invitee "ha[s] a right to assume that the premises, aside from obvious dangers, [are] reasonably safe for the purpose for which he [is] upon them, and that proper precaution [has] been taken to

make them so." *Garafano v. Neshobe Beach Club*, 126 Vt. 566, 572, 238 A.2d 70, 75 (1967). We have already held that a ski area owes its customers the same duty as any other business — to keep its premises reasonably safe. *Stearns v. Sugarbush Valley Corp.*, 130 Vt. 472, 474, 296 A.2d 220, 222 (1972).

The policy rationale is to place responsibility for maintenance of the land on those who own or control it, with the ultimate goal of keeping accidents to the minimum level possible. Defendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone can properly maintain and inspect their premises, and train their employees in risk management. They alone can insure against risks and effectively spread the cost of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.

If defendants were permitted to obtain broad waivers of their liability, an important incentive for ski areas to manage risk would be removed, with the public bearing the cost of the resulting injuries. See *Tunkl*, 383 P.2d at 446-47; Prosser and Keeton on the Law of Torts § 68, at 482 (5th ed. 1984). It is illogical, in these circumstances, to undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control.

For these reasons, we disagree with the decisions of the United States District Court for the District of Vermont, upholding exculpatory agreements similar to the one at issue here. We do not accept the proposition that because ski resorts do not provide an essential public service, such agreements do not affect the public interest. *Szczotka v. Snowridge, Inc.*, No. CIV. 5:93-370, 1994 WL 674015, at *2 (D. Vt. 1994); *Barenthein*, slip op. at 6. A recognition of the principles underlying the duty to business invitees makes clear the inadequacy of relying upon the essential public service factor in the analysis of public recreation cases. While interference with an essential public service surely affects the public interest, those services do not represent the universe of activities that implicate public concerns.

Moreover, reliance on the private nature of defendants' property would be inconsistent with societal expectations about privately owned facilities that are open to the general public. Indeed, when a facility becomes a place of public accommodation, it "render[s] a 'service which has become of public interest' in the manner of the innkeepers and common carriers of old." *Lombard v. Louisiana*, 373

U.S. 267, 279 (1963) (Douglas, J., concurring) (citation omitted) (quoting *German Alliance Ins. v. Kansas*, 233 U.S. 389, 408 (1914)). Defendants are not completely unfettered, as they argue, in their ability to set the terms and conditions of admission. Defendants' facility may be privately owned, but that characteristic no longer overcomes a myriad of legitimate public interests. Public accommodations laws that prohibit discrimination against potential users of the facility are just one example of limitations imposed by law that affect the terms and conditions of entry. See 9 V.S.A. § 4502 (prohibiting discrimination in place of public accommodation).

■  Defendants argue that the public policy of the state, as expressed in the "Acceptance of inherent risks" statute, 12 V.S.A. 1037,[2] indicates a willingness on the part of the Legislature to limit ski area liability. Therefore, they contend that public policy favors the use of express releases such as the one signed by plaintiff. On the contrary, defendants' allocation of responsibility for skiers' injuries is at odds with the statute. The statute places responsibility for the "inherent risks" of any sport on the participant, insofar as such risks are obvious and necessary. *Id.* A ski area's own negligence, however, is neither an inherent risk nor an obvious and necessary one in the sport of skiing. Thus, a skier's assumption of the inherent risks of skiing does not abrogate the ski area's duty "'to warn of or correct dangers which in the exercise of reasonable prudence in the circumstances could have been foreseen and corrected.'" *Estate of Frant v. Haystack Group, Inc.*, 162 Vt. 11, 18, 641 A.2d 765, 769 (1994) (quoting *Dillworth v. Gambardella*, 970 F.2d 1113, 1119 (2d Cir. 1992)).

*Reversed and remanded.*

---

[2] "Notwithstanding the provisions of section 1036 of this title, a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary." 12 V.S.A. § 1037.