### Peter and Marjorie Behr v. Norman Hook, d/b/a Norm's Painting, Dead River Company of Maine and Jaynes and Berge, Inc.

[787 A.2d 499]

No. 00-223

Present: Amestoy, C.J., Morse, Johnson and Skoglund, JJ., and Cook, D.J., Specially Assigned

Opinion Filed September 28, 2001
Motion for Reargument Denied November 14, 2001

*Richard J. Windish, Jr.* of *Eaton & Hayes*, Woodstock, and *Richard C. Glazer* of *Cozen and O'Connor*, Philadelphia, Pennsylvania, for Plaintiffs-Appellants.

*James E. Preston* of *Pierson, Wadhams, Quinn & Yates*, Burlington, for Defendant-Appellee Hook.

*Kimberly L. Carboneau* of *Boylan & Richards, P.C.*, Springfield, for Defendant-Appellee Dead River Company of Maine.

**Skoglund, J.** Plaintiffs Peter and Marjorie Behr, whose newly constructed home was destroyed by fire shortly before they were to move into it, appeal the superior court's summary judgment ruling upholding a waiver-of-subrogation provision contained in the construction contract entered into between the Behrs and their general contractor. Under the court's ruling, the Behrs' insurer — the real party in interest in this subrogation action — may not recoup from defendant subcontractors, who are alleged to have caused the fire, the $1.4 million the insurer paid the Behrs for the fire loss. We reject plaintiffs' arguments that (1) given their allegations of gross negligence, public policy considerations precluded the superior court from enforcing the waiver-of-subrogation provision; (2) apart from considerations of public policy, the provision should not apply because the general contractor failed to obtain waivers from the subcontractors, as required by the contract; and (3) a portion of the damages were outside the scope of the provision, even if it was applicable. Accordingly, we affirm the superior court's grant of summary judgment in favor of defendants.

In March 1995, the Behrs contracted with Jaynes & Berge, Inc. for the construction of their new home. They signed a standard contract published by the American Institute of Architects (AIA). The contract required the Behrs to purchase and maintain property insurance in the amount of the initial contract plus any later modifications for work done at the site. The contract explicitly required the policy to insure against the perils of fire, among other things. The contract also included a waiver-of-subrogation provision that required the Behrs and the general contractor to waive all rights against each other and any of their subcontractors for damages caused by fire to the extent covered by insurance obtained pursuant to the contract. Further, the provision required that the insurance policies obtained pursuant to the contract provide waivers of subrogation, as set forth in the contract, by endorsement or otherwise.[1]

---

[1] The waiver-of-subrogation provision, in its entirety, provides as follows:

> **Waivers of Subrogation.** The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property

Construction on the home proceeded through the summer and fall of 1995. Then, in the early morning hours of December 8, 1995, the Behrs' recently completed home was destroyed by fire. The state police fire marshal determined that a propane heater owned by one subcontractor and left unattended by another subcontractor was the most probable source of the ignition that caused the fire. The Behrs' insurer paid the Behrs $1.4 million for the loss and initiated a subrogation action, in the Behrs' name, against the subcontractor who owned the heater, Dead River Company of Maine d/b/a Leonard's Gas & Electric Service (hereinafter Dead River), and the painting subcontractor who left the heater unattended, Norman Hook d/b/a Norm's Painting. Plaintiffs alleged that the painting subcontractor acted in a grossly negligent manner by leaving the heater unattended propped near a freshly painted porch to accelerate the drying process on a cold night. Plaintiffs also alleged both ordinary and gross negligence against Dead River, claiming that the heating subcontractor failed to instruct others how to use the heater safely around combustible material, failed to place proper warnings on the heater, and failed to provide an appropriate guard or other safety device on the heater to prevent ignition of combustible materials.

Both defendants filed motions for summary judgment based upon the waiver-of-subrogation provision contained in the construction contract. After hearing oral argument, the superior court granted the motions. Relying on *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 658 A.2d 31 (1995), the court concluded that the intent of the contractual language was unambiguous, and that public policy considerations did not preclude the waiver of subrogation contained in the contract. On appeal from a

insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

decision granting summary judgment, we apply the same standard applied by the trial court — we will affirm the judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See *Hamelin v. Simpson Paper Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997).

## I.

Plaintiffs' primary argument on appeal is that public policy considerations preclude applying a waiver-of-subrogation provision when gross, as opposed to ordinary, negligence is alleged. In making this argument, plaintiffs concede that parties in Vermont may contractually exculpate themselves from their negligent conduct in certain circumstances, but contend that public policy should not allow a party to contractually waive responsibility for reckless conduct that imperils the public. We conclude that, given the circumstances of this case, the instant waiver-of-subrogation provision does not violate public policy.

While acknowledging that exculpatory clauses are traditionally disfavored and subject to exacting judicial scrutiny, *Fairchild Square*, 163 Vt. at 437, 658 A.2d at 33, we have recognized that such clauses should be upheld when they are freely and fairly made between parties in an equal bargaining position and do not interfere with any social interest. *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 332, 670 A.2d 795, 797 (1995) (citing Restatement (Second) of Torts § 496B comment b (1965)). Among the relevant considerations in determining the appropriateness of applying a particular exculpatory clause are (1) whether the contract concerns a business suitable for public regulation; (2) whether the party seeking exculpation is performing a service of great importance to the public; (3) whether that party holds itself out as willing to perform the service for any member of the public; (4) whether, as a result of the essential nature of the service, that party has a decisive bargaining position; (5) whether that party confronts the public with a standardized adhesion contract of exculpation; (6) whether the contract was fairly entered into; and (7) whether the parties' intent is expressed in clear and unambiguous language. *Dalury*, 164 Vt. at 332-33, 670 A.2d at 797. Because the context of the contract is critical, *Fairchild Square*, 163 Vt. at 437, 658 A.2d at 33, the determination of whether an exculpatory clause violates public policy depends ultimately upon " 'the totality of the circumstances . . . against the backdrop of

current societal expectations.' " *Dalury*, 164 Vt. at 333-34, 670 A.2d at 798; see *New Light Co. v. Wells Fargo Alarm Servs.*, 525 N.W.2d 25, 30 (Neb. 1994) (whether particular exculpatory clause in contractual agreement violates public policy depends upon parties involved and facts and circumstances of agreement; "[t]he greater the threat to the general safety of the community, the greater the restriction on the party's freedom to contractually limit the party's liability").

The instant case concerns a standardized waiver-of-subrogation clause in a construction contract between private parties in relatively equal bargaining positions. Such clauses are intended to allows the parties "to exculpate each other from personal liability in the event of property loss or damage to the work to the extent each party is covered by insurance." *IRMA v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc.*, 692 N.E.2d 739, 744 (Ill. App. Ct. 1998). By shifting the risk of loss to the insurance company regardless of which party is at fault, these clauses seek to avoid "the prospect of extended litigation which would interfere with construction." *Id.*; see *Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau*, 786 F.2d 101, 104 (2d Cir. 1986) (waiver-of-subrogation clause is useful in construction projects "because it avoids disruption and disputes among the parties to the project" by eliminating need for lawsuits and protecting contracting parties from loss by bringing all property damage under builder's all-risk property insurance).

Courts have allowed such clauses on public policy grounds because they limit a party's recovery "only to property loss . . . and only to the extent that [the loss] was covered by insurance." *IRMA*, 692 N.E.2d at 745; see *Chadwick v. CSI, Ltd.*, 629 A.2d 820, 825-26 (N.H. 1993) (waiver-of-subrogation provisions in construction contracts are not designed to unilaterally relieve one party from effects of its future negligence, thereby foreclosing another party's avenue of recovery; rather, such provisions are aimed at ensuring that damages incurred during construction projects are covered by appropriate types of insurance); *Viacom Int'l Inc. v. Midtown Realty Co.*, 602 N.Y.S.2d 326, 331 (App. Div. 1993) ("such clauses merely reflect [the parties'] allocation of the risk of liability, as between themselves, to third parties through the device of insurance"); see also S. Turner, *Insurance Coverage of Construction Disputes* § 5:7, at 14 (2d ed. 2001) ("waivers of subrogation are quite common in construction contracts as to the subrogation rights of property insurance insurers

. . . . and case law has upheld these waivers, against . . . the subrogated insurer"). The courts have recognized that because the clauses typically require insurance policies to acknowledge the insureds' waiver of subrogation rights, the insurers presumably take this fact into account in fixing premiums. See *Kaf-Kaf, Inc. v. Rodless Decorations, Inc.*, 687 N.E.2d 1330, 1333 (N.Y. 1997).

This Court has also treated such clauses favorably in a similar context. In *Fairchild Square*, we upheld a waiver-of-subrogation provision in a commercial lease agreement that allocated the responsibility of purchasing fire insurance to the landlord and contemplated that the parties would be reimbursed for fire loss through that policy. 163 Vt. at 435-37, 658 A.2d at 34-35. In affirming the trial court's determination that the landlord had waived recovery for damages from a fire negligently caused by the tenant, we noted that the waiver-of-subrogation clause was plainly "intended to distribute the risk of loss by fire in a predictable way so that two commercial entities could insure against potential harm in the most logical and economic way," and that public policy considerations favored an agreement that avoided higher overall costs resulting from the multiplicity of insurance policies and overlapping coverage. *Id.* at 442, 658 A.2d at 36.

Plaintiffs attempt to distinguish *Fairchild Square* solely on the basis that defendants' conduct was allegedly grossly negligent.[2] This sole distinction, in light of the circumstances of this case, does not convince us that the challenged provision violates public policy. Plaintiffs attempt to equate an allegation of gross negligence with wilful and wanton conduct, but this Court has explained that gross negligence

> falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong. Ordinary and gross negligence differ in degree of inattention, while both differ in kind from wilful and

---

[2] Although plaintiffs alleged gross negligence against Dead River in their complaint, they failed to renew this claim in their response to defendants' motions for summary judgment. Indeed, plaintiffs stated at the summary judgment hearing that there was no allegation of gross negligence against Dead River, and the trial court found the same. Consequently, plaintiffs have waived any claim that the superior court should have denied Dead River's motion for summary judgment because of their allegation of gross negligence. They have not waived this argument with respect to Norm's Painting, however.

intentional conduct which is or ought to be known to have a tendency to injure.

*Shaw, Adm'r v. Moore*, 104 Vt. 529, 531-32, 162 A. 373, 374 (1932); see *Agra-By-Products, Inc. v. Agway, Inc.*, 347 N.W.2d 142, 151 (N.D. 1984) (even grossest negligence of insured cannot be equated with wilful conduct; gross negligence is not wilful as matter of law).

■ We have recognized that juries must often determine the unclear dividing line between ordinary and gross negligence. See *Hardingham v. United Counseling Serv.*, 164 Vt. 478, 487, 672 A.2d 480, 486 (1995) (Dooley, J., dissenting) ("Like many other courts, we found that the only reasonable course of action was to leave the decision of whether gross negligence was present to the jury except in the most extreme cases."). If we were to accept plaintiffs' argument, plaintiffs in later cases would be able to negate waiver-of-subrogation provisions, and the public policy considerations supporting them in contexts such as the instant one, merely by alleging gross negligence and trusting that the trial court would allow the jury to determine if the defendants' conduct sunk to that uncertain level. We decline to adopt this position. Notwithstanding plaintiffs' allegations of gross negligence against defendants, we conclude that, in the context of this case, the instant waiver-of-subrogation provision does not violate public policy. Cf. *Agra-By-Products, Inc.*, 347 N.W.2d at 151 (upholding waiver-of-subrogation provision and concluding that, because gross negligence cannot be equated with wilful conduct, trial court did not err in refusing to allow plaintiff to amend complaint to allege fire was caused by defendants' gross negligence).

Indeed, plaintiffs have utterly failed to demonstrate how the public would be adversely affected by upholding such clauses in circumstances similar to those present here. Nor are we persuaded to adopt plaintiffs' position based on cases, cited by plaintiffs, that involve substantially different circumstances or that fail to provide a reasonable basis for the stance they have taken. See, e.g., *Indiana Ins. Co. v. Erhlich*, 880 F. Supp. 513, 521 (W.D. Mich. 1994) (summary judgment not appropriate "at this juncture" because defendants have not addressed issue of gross negligence); *Butler Mfg. Co. v. Americold Corp.*, 841 F. Supp. 1107, 1111 (D. Kan. 1993) (exculpatory provisions of leasehold contract deemed invalid to extent that they can be read to limit defendants' liability for gross

negligence or wilful or wanton conduct); *Federal Ins. Co. v. Honeywell, Inc.*, 641 F. Supp. 1560, 1562 (S.D.N.Y. 1986) (public policy voids any provision in burglar alarm contract exculpating party from liability for gross negligence or wilful or wanton misconduct); *Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 687 N.E.2d 1263, 1265 (Mass. App. Ct. 1997) (substantial authority, often in racetrack context, take position that while party may contract against liability for harm caused by its negligence, it may not do so with respect to its gross negligence).

## II.

Next, plaintiffs argue that the waiver-of-subrogation provision should not have been enforced against them because the general contractor failed to obtain waivers from its subcontractors, as required by the provision. In relevant part, the construction contract provides that the owner and contractor waive all rights against (1) each other and their agents or subcontractors and (2) the architect, the architect's consultants, and separate consultants and their subcontractors for damages caused by fire to the extent covered by property insurance obtained pursuant to the contract. The owner or contractor, "as appropriate, shall require of the Architect, Architect's consultants, separate contractors . . . and the subcontractors . . . of any of them, similar waivers each in favor of other parties enumerated herein." According to plaintiffs, by not obtaining waivers from defendants, the general contractor materially breached the contract, thereby preventing defendants from enforcing the waiver-of-subrogation provision.

We do not find this argument persuasive. We first note that the quoted sentence from the waiver clause is, at best from plaintiffs' perspective, ambiguous as to whether it applies to the subcontractors or to the general contractor. In requiring the owner or contractor to obtain waivers, the quoted language appears to track only those persons and entities designated in the second group, which does not include subcontractors to the general contractor. In any event, the contract does not make obtaining the waivers from subcontractors a condition precedent to application of the waiver-of-subrogation provision. Indeed, rather than specify any consequences to follow from failure to obtain waivers from the subcontractors, the contract provides that a "waiver of subrogation shall be effective" even against those persons or entities that "would otherwise have a duty

of indemnification" or "did not pay the insurance premium directly or indirectly."

The plain intent of the parties was to make the Behrs' insurer bear the risk of property damage resulting from fire or other perils. Because the waiver-of-subrogation provision required that the waiver be recognized in the insurance policy, the insurer knew the risk when it insured plaintiffs and presumably set the rates based on that risk. The absence of mutual waivers with respect to the subcontractors was not a material breach affecting the primary purpose of the provision, which was to protect the contractor and its subcontractors from liability for accidental property loss. Cf. *Indiana Ins. Co.*, 880 F. Supp. at 520 (even if failure to include waiver-of-subrogation provision in contract with separate contractor could somehow remove that contractor from definition of "separate contractor" in primary contract, separate contractor would nonetheless fall under protection of waiver-of-subrogation clause contained in latter contract by virtue of separate contractor's status as third-party beneficiary).

### III.

Finally, plaintiffs argue that, even if the waiver-of-subrogation provision is effective, a portion of their damages was outside the scope of the clause. According to plaintiffs, because the contract provisions require them to obtain property insurance only "in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work," the waiver-of-subrogation provision is not applicable to $181,840 in costs stemming from services — kitchen and pantry cabinets, plumbing fixtures, and landscaping — that were specifically excluded from the contract.

Again, we disagree. The waiver-of-subrogation provision explicitly applies to the extent that there is "property insurance obtained pursuant to" the contract. The contract requires insurance coverage for the "entire Work at the site on a replacement cost basis." It is undisputed that plaintiffs obtained insurance coverage that compensated them for their entire loss. Therefore, the waiver-of-subrogation provision applies to the extent of that coverage. See *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 146-47 (Ct. App. 1994) (standard AIA waiver-of-subrogation provision applies to extent of any insurance coverage required under contract, even if that insurance extends beyond that required by

132

contract); *Haemonetics Corp. v. Brophy & Philips Co.*, 501 N.E.2d 524, 526 (Mass. App. Ct. 1986) (same); *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493-94 (Minn. 1998) (agreeing with *Lloyd's Underwriters* and citing majority of jurisdictions that concur); cf. *Fairchild Square*, 163 Vt. at 440-41, 658 A.2d at 35 (rejecting landlord's argument that it waived recovery for fire damage only to tenant's apartment and not adjoining apartments, and noting that it "does not make sense to hold the tenant responsible for damage to nondemised premises even though landlord would purchase fire insurance to cover these premises"). But see *Town of Silverton v. Phoenix Heat Source System, Inc.*, 948 P.2d 9, 12 (Colo. Ct. App. 1997) (scope of waiver-of-subrogation provision is limited to value of work performed under contract — installation of new roof on town hall). The Behrs had a right under the contract to make separate agreements with other contractors for different aspects of the construction project, but only under conditions imposed by the contract, including those contained in the waiver-of-subrogation provision.

*Affirmed.*