Leandro UMALI, Plaintiff,

v.

MOUNT SNOW LTD., USA Cycling, Inc. National Off–Road Bicycling Association, Defendants.

No. 2:01–CV–291.

United States District Court, D. Vermont.

Feb. 28, 2003.

John Joseph Collins, Collins, McMahon & Harris, P.L.L.C., Burlington, VT, Richard P. Hackman, Esq., George W. Howard, III, P.C., William C. Bensley, Esq., Edward M. Nass, Esq., Howard, Brenner & Nass, PC, Philadelphia, PA, for Leandro Umali.

John J. Zawistoski, Esq., Ryan, Smith & Carbine Ltd., Rutland, VT, for Mount Snow, Ltd., American Skiing Company and American Skiing Resort Properties, Inc.

Robert Cabaniss Roesler, Roesler, Whittlesey, Meekins & Amidon, Burlington, VT, Richard W. Hollstein, Esq., Hollstein, Keating, Cattell, Johnson & Goldstein, P.C., Philadelphia, PA, for USA Cycling Inc. and National Off–Road Bicycle Association.

Donna L. De Lorme, Hollstein, Keating, Cattell, Johnson & Goldstein, P.C., Philadelphia, PA, for General Motors Corp.

## OPINION AND ORDER

SESSIONS, Chief Judge.

Plaintiff Leandro Umali ("Umali") has sued Defendants National Off–Road Bicycling Association ("NORBA"), USA Cycling, Inc. ("USAC"), and Mount Snow, Ltd. ("Mount Snow")[1] jointly and severally for gross negligence, and willful and wanton acts and omissions in the design and construction of a dual slalom bicycle race course. NORBA, USAC, and Mount Snow have moved for summary judgment on the basis that Umali released them from these claims. Alternatively, Defendants seek summary judgment under Vermont's sports injury statute, Vt. Stat. Ann. tit. 12, § 1037 (Lexis 2002), on the basis that the bike jump upon which the accident occurred was an "obvious and necessary" danger that Umali accepted as a participant in the dual slalom race. For the following reasons, the Court **DENIES** Defendants' Motion.

### Factual Background

The following facts are largely undisputed, but are taken in the light most favorable to the non-moving party. Umali was injured while participating in a dual slalom

---

1. Original defendants General Motors and American Skiing Company have been dismissed from this action by stipulation.

mountain bicycle race at Mount Snow, in West Dover, Vermont, which was organized and sponsored by NORBA and USAC. He was a "beginner"[2] dual slalom bike racer, although he had significant experience in mountain sports and biking prior to the accident. He had also worked in a bicycle repair shop and was a member of an organized bicycle racing team.

Before the race, Umali signed a series of application and entry forms, each of which contained releases and waivers pertaining to events organized and sponsored by USAC and NORBA. In December 1998, while in Colorado, Umali executed a United States Cycling Federation Official's Application ("Official's Application") and a USA Cycling Membership Application ("Membership Application"). In April 1999, Umali executed a USA Cycling Membership Renewal Application ("Membership Renewal Application") and mailed it to USAC's Colorado headquarters. Finally, just prior to the August 1999 race, on July 22, 1999, Umali signed an Official Application to the Mt. Snow race and an Official Entry Form ("Official Entry Form").

The December Official's Application contained language in which Umali agreed to "waive, release and discharge [himself], [his] heirs, executors and any and all claims against the USCF, USA Cycling, Inc. and race organizers, sponsors, clubs, etc. as a result of [his] association or participation in any USA Cycling, Inc. permitted events." The Membership Application, as well as the April Membership Renewal Application stated that Umali voluntarily agreed to:

release and forever discharge, hold harmless, indemnify, including as to attorney fees, and promise not to sue Releasees on, from or against, and waive, any claims, damages, expenses or demands arising directly or indirectly from or attributable in any way to the negligence, action or failure to act of any of Releasees in connection with sponsorship, organization or execution of any bicycle racing or sporting event, including travel to and from such event, in which [signee] may participate as a rider, team member, spectator or in any other manner.[3]

The July Official Entry Form contains the following pertinent language:

I HEREBY WAIVE, RELEASE, DISCHARGE, HOLD HARMLESS, PROMISE NOT TO SUE AND INDEMNIFY the Releasees, Mount Snow, Ltd. and the sponsors of this event, the organizer and any promoting organization(s), property owners including Mount Snow, Ltd., its owners, affiliates, agents and employees, law enforcement agencies, all public entities, special districts and properties (and their respective agents, officials and employees) through or by which the event will be held (the foregoing are also collectively deemed to be Releasees), FROM ANY and all rights and CLAIMS INCLUDING CLAIMS ARISING FROM THE RELEASED PARTIES' OWN NEGLIGENCE which I have or which hereafter accrue to me and from any and all damages which may be sustained by me directly or indirectly in connection with, or arising out of my participation in or

---

2. When Umali applied to participate in the race he classified himself as such on the Official Entry Form.

3. On April 14, 1996, Umali signed a National Off–Road Bicycle Association Race Day Membership and License Application and, on April 5, 1998, he signed a National Collegiate Cycling Association Race Day Application. Both forms contained release language which is identical to that of the Membership and Membership Renewal Applications.

association with the event, or travel or return from the event. . . .

I agree that any suit or legal action against Mount Snow, Ltd., its employees and/or agents shall be brought in the State and Federal Courts having jurisdiction and shall be governed by the law of the State of Vermont. If any part of this agreement is determined to be enforceable all other parts shall be given full force and effect to the extent permitted by Vermont law.

The NORBA Dual Slalom Series at Mount Snow was open to all racing skill levels, ranging from professional and semi-professional to beginner. In order to participate, beginners had to purchase a one-day license for $30, which was made available on the day of the race.

NORBA and USAC built the dual slalom as a temporary course a number of weeks prior to the event. The course was designed with a "double jump" finish rather than a "table top" finish. According to Umali, "table top" finishes are more traditional and suitable to races involving varying levels of expertise, because they allow less experienced riders to "roll" through the finish line without becoming airborne. Umali also claims that this "double jump" was more dangerous than normal "double jumps" because the peak of its first jump was very sharp and its backside was unusually steep. He alleges that because the "double jump" was at the end of the race and unusually steep, it was especially difficult for beginners to avoid losing control while airborne and colliding with the second jump beyond the finish line.

Before his fateful training run, Umali had completed two practice runs, personally inspected the course, observed others complete it, and devised a strategy to negotiate the full course in actual competition. At the end of his third practice run, on the first jump of the finish line's "double jump," Umali and his bicycle became

airborne. He came off the bicycle in mid-air and landed head-first against the second of the two jumps. He sustained serious injuries which rendered him a paraplegic.

Umali asserts that his injuries were directly and proximately caused by Defendants' knowing, reckless, wanton, and willful course design and construction, specifically because he was unable to "roll through" the first jump, and the second jump created an obstruction to the racers' path approximately 20 feet beyond the finish line.

Umali originally filed suit against Mount Snow, USAC, and NORBA in the District Court for the Eastern District of Pennsylvania. The District Court granted a motion for transfer venue by Mount Snow, USAC, and NORBA, and pursuant to 28 U.S.C. § 1404(a), ordered that the case be transferred to the District of Vermont.

**Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if the "pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits ... show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is precluded if a disputed fact exists that might affect the outcome of the suit under controlling substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The burden is on the moving party to demonstrate the absence of a genuine issue of material fact, and in considering the motion, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

## Choice of Law [4]

USAC and NORBA assert that Colorado law should apply to the initial series of exculpatory agreements signed by Umali and that Vermont law should apply to the release contained in the Official Entry Form that was signed closest to the date of the race. Umali asserts that all of the Releases are merged into the most recent release contained in the Official Entry Form.

■■■ To resolve this dispute, because this case was transferred from the Eastern District of Pennsylvania, the Court must first decide upon the appropriate choice of law rules. Federal courts exercising diversity jurisdiction apply the choice of law rules of the forum state to decide which state's substantive law governs. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 74–77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When a case is transferred pursuant to 28 U.S.C. § 1404(a), however, the transferee court normally applies the choice of law rules that would have been applied had there been no change of venue, so long as the original court could have maintained the action had it remained there. *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *see also* 1 Moore's Federal Practice, ¶ 0.145[4.–5] (2d ed.1983), at 1613.

On this basis, the parties agree that Pennsylvania choice of law rules apply.

In *Griffith v. United Air Lines, Inc.*, the Pennsylvania Supreme Court adopted a flexible choice of law methodology. 416 Pa. 1, 203 A.2d 796 (1964). This methodology combines the approaches of the Restatement (Second) of Conflicts [5] and of "interest analysis," which is a qualitative appraisal of the relevant states' policies with respect to the controversy. *Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir.1978).

■■ In a claim arising from an accident, Pennsylvania's choice of law approach is to consider which state has a "greater interest in having its law applied." *LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1071–1072 (3d Cir.1996). In *LeJeune*, the Third Circuit noted that in making the choice of law determination, Pennsylvania courts look "to see what contacts each state has with the accident," the contacts being relevant only if they relate to the "policies and interest underlying the particular issue before the court." *Id.* It indicated that " . . . a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale." *Id.* (citing *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970)) (citations omitted). The *LeJeune* court also indicated that where the site of an accident is not simply by chance, i.e., the site was a cho-

---

**4.** The Court has jurisdiction over this matter based on diversity and thereby applies the most relevant state law to the substantive issues before it. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**5.** Section 6 of the Restatement (Second) of Conflicts provides:
  (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
  (2) When there is no such directive, the factors relevant to the choice of the applica-

ble rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in determination and application of the law to be applied.

sen location for an event or business, "the place of injury assumes much greater importance, and in some instances may be determinative" of which state's law to apply. *Id.* (citing *Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 401 (3d Cir.1987); *Shuder v. McDonald's Corp.*, 859 F.2d 266, 272 (3d Cir.1988)).

■ Applying Pennsylvania's choice of law doctrine to this case reveals that although Colorado has some interest in this matter, that interest is significantly less substantial than Vermont's. Umali's accident and injury occurred in this state at Mount Snow, which is a Vermont corporation.[6] In addition, Defendants, as mountain sports events organizers and hosts, have had and continue to have a significant relationship and contacts with Vermont. Vermont, in turn, has a significant interest in the conduct in question; that is, mountain sports represent an important recreation for Vermonters and for those who visit the state.

USAC and NORBA argue that because they are Colorado corporations, because they planned the Mount Snow race from Colorado and because Umali signed the Official's and Membership and Membership Renewal Applications in Colorado, Colorado has more significant contacts with respect to this race than does Vermont. But such logic misses the point of Pennsylvania's conflict of law doctrine. As mentioned above, "... a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale." *Id.*

Under a qualitative analysis, Vermont's contacts and interests far outweigh those of Colorado. USAC and NORBA and others like them will undoubtedly continue to sponsor and run events in Vermont. Vermont, therefore, must be able to regulate events like the race in question and to develop consistent and specific legal doctrine to protect both the mountain sports industry and its component parts, including its racing participants.[7] Indeed, the Vermont Supreme Court has already taken an active role in this regard. *See e.g., Spencer v. Killington, Ltd.,* 167 Vt. 137, 702 A.2d 35 (1997) (ski race open to the general public involves the public interest and public policy considerations). In light of the serious nature of the claim and the potential that future such events could result in injuries to Vermonters and visitors to the state, Vermont has a special interest in this kind of litigation.

In sum, Vermont's qualitative connection to and interest in this case is more significant than that of Colorado. The Court, therefore, applies Vermont law to the facts and legal questions now before it.

**Releases Void as Contrary to Public Policy**

■ The releases seek to absolve Defendants from any and all liability surrounding the NORBA race and events like it. The Vermont Supreme Court has, in recent years, refused to absolve ski areas and sports events organizers and sponsors from any and all liability in the context of recreational skiing, as well as in organizing, designing and operating events like

---

6. It is noteworthy that Mount Snow has not identified any significant contacts with Colorado.

7. It is also worth noting that the Official Entry Form, the only release containing any choice of law clause, specifies Vermont as its forum and law of choice. The other releases neither pertain to the specific race in ques-

tion, nor contain choice of law clauses. The Official Entry Form thereby constitutes the only evidence of any agreement between the parties as to what law should apply to a claim like this one. In addition, in their argument to transfer this case from the Eastern District of Pennsylvania to the District of Vermont, Defendants made a number of compelling points about Vermont's interest in this matter.

the race in question. *See Dalury v. S–K–I, Ltd.*, 164 Vt. 329, 333, 670 A.2d 795, 799 (1995); *see Spencer*, 167 Vt. at 142–43 702 A.2d at 37–38; *see also* Beth Robinson, *Playing it Safe: Allocating the Risk of Harm on the Slopes*, 25–MAR Vt. B.J. & L. Dig. 15, 16 (1999). In doing so, the court has indicated that a broad pre-injury release from liability is void as against public policy because it is simply wrong to put one party to a contract at the mercy of the other's negligence. *See e.g., Dalury*, 164 Vt. 329, 333, 670 A.2d 795, 799 (citing *Hiett v. Lake Barcroft Cmty. Ass'n*, 244 Va. 191, 418 S.E.2d 894, 897 (1992)).

The Vermont Supreme Court's seminal case in this regard is *Dalury v. S–K–I, Ltd.*, 164 Vt. at 333, 670 A.2d at 799. In *Dalury*, a recreational skier signed a form releasing Killington, Ltd. "from any and all liability" for damages resulting from, among other things, "negligence, conditions of the premises, operations of the ski area, [and] actions or omissions of employees or agents of the ski area." *Id.* Upon being seriously injured when he skied into a metal pole that was part of a ski lift line, Dalury alleged negligent design, construction, and placement of the pole. *Id.* The Vermont Supreme Court refused to enforce the release, holding that "exculpatory agreements ... releasing defendants from all liability resulting from negligence, are void as contrary to public policy." *Id.*, 164 Vt. at 330, 670 A.2d at 796. The Court relied primarily on the public policy goal underlying premises liability law: "to place responsibility for maintenance of the land on those who own or control it, with the ultimate goal of keeping accidents to the minimum level possible." *Id.*, 164 Vt. at 335, 670 A.2d at 799. The Court reasoned that:

> [Ski area operators], not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone can properly maintain and inspect their premises, and train their employees in risk management. They alone can insure against risks and effectively spread the cost of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.

*Id.*

The *Dalury* court reasoned that because ski areas are open to the public, and because they advertise and invite skiers and non-skiers of every level, skiers' safety triggers public policy considerations. *Id.* Based on this reasoning, the court found that pre-injury releases like the one signed by Dalury implicate a legitimate public concern and thus refused to enforce it as contrary to public policy. 164 Vt. at 334–336, 670 A.2d at 799.

In 1997, in *Spencer v. Killington, Ltd.*, the Vermont Supreme Court again declined to enforce an exculpatory release, signed, in that instance, by a participant in an amateur ski race series. 167 Vt. at 142–43, 702 A.2d at 37–38. In *Spencer*, the plaintiff sued for serious injuries he claimed were caused by negligent design and construction of a race course after he collided with a wooden post that marked the end of the course's finish line. 167 Vt. at 139, 702 A.2d at 35.

In the dissent, Justice Allen, joined by Justice Dooley, argued that the public policy analysis of recreational skiing in *Dalury* did not apply to ski racing, because racing is limited in terms of public participation and recognized as a particularly hazardous activity. 167 Vt. at 144, 702 A.2d at 38–39. But Justice Johnson, writing for the majority, concluded that "the public policy concerns that formed the basis for [the court's] holding in *Dalury* [should] apply with equal force" to an amateur ski race.

167 Vt. at 142, 702 A.2d at 37. In so ruling, the court emphasized that the race was open to the general public, particularly persons with limited or no experience in competitive skiing. *Id.* It reasoned that, as in *Dalury,* the defendants, not the skiers participating in the races, "had the expertise and opportunity to maintain and inspect their premises, to foresee and control hazards, to train employees in risk management, to guard against the negligence of their agents and employees, and to insure against the risks and spread the increased cost of insurance among race participants and all skiing customers." *Id.* In short, the *Spencer* court saw no "salient distinctions between [its case] and *Dalury*" and found that the *Dalury* logic was no less true in the context of an amateur race. 167 Vt. at 143, 702 A.2d at 38.

Defendants argue that the NORBA dual slalom was a professional race with limited participation, which they contend distinguishes it from the amateur race in *Spencer.* The Vermont Supreme Court enforced an exculpatory release involving professional mountain sports in *Douglass v. Skiing Standards, Inc.,* 142 Vt. 634, 459 A.2d 97 (1983). However, both *Dalury,* 164 Vt. at 331, 670 A.2d at 796, n. 1, and *Spencer,* 167 Vt. at 141, 702 A.2d at 36, noted that in *Douglass,* the question of whether the release therein was contrary to public policy was never raised, thereby leaving the door open as to whether the "contrary to public policy" doctrine could have controlled in that context as well.

Moreover, the Second Circuit has indicated how *Spencer* might affect the ruling in *Douglass,* based on its remand of a subsequent case involving a race with limited participation. *See Nishi v. Mount Snow,* 111 F.3d 123 (2d Cir.1997). In *Nishi v. Mount Snow,* 935 F.Supp. 508, 511 (D.Vt.1996), this Court applied Vermont law to enforce a NORBA exculpatory release against a mountain bike racer. This Court distinguished *Dalury* finding that the plaintiff had chosen to enter a "discrete racing competition held over a period of three days, open only to members of the NORBA mountain bike association, who specifically registered for the race and signed a release acknowledging the heightened dangers of competition." *Id. Spencer* was decided shortly thereafter, and the Second Circuit vacated the *Nishi* decision and remanded it for further proceedings in light of the similarity of the bike race to the amateur ski race in *Spencer.* 111 F.3d 123. This Court did not reach the relevance of *Spencer* because on remand the case was dismissed for failure to prosecute.

The Second Circuit's decision in *Nishi,* combined with *Dalury* and *Spencer,* however, make it clear that whether or not the race is professional or amateur is not dispositive regarding the waivers' enforceability. Indeed, *Dalury* counsels a totality of circumstances test that "considers each given case against a backdrop of current societal expectations." 164 Vt. at 333, 670 A.2d at 799. *Dalury* and *Spencer* suggest that, rather than just assessing the characterization of a race as pro or amateur, the relevant circumstances include access to the general public and the participation of varying skill levels. *Dalury,* 164 Vt. at 332–33, 670 A.2d at 798–99; *Spencer,* 167 Vt. at 141–42, 702 A.2d at 37–38. Like the race in *Spencer,* the NORBA dual slalom race was open to varying skill levels, ranging from professionals and beginners. Defendants, like the defendants in *Spencer,* had the "expertise and opportunity to maintain and inspect their premises, to foresee and control hazards, to train employees in risk management, to guard against the negligence of their agents and employees, and to insure against the risks and spread the increased cost of insurance among race participants and all ... customers." 167 Vt. at 142, 702 A.2d at 37.

Further, as noted in *Spencer*, "[i]f defendants were permitted to obtain broad waivers of their liability, an important incentive for [mountain sports] areas to manage risk would be removed, with the public bearing the cost of the resulting injuries." *Id.* (quoting *Dalury* at 335, 670 A.2d at 799).

Because this race was open to all skill levels and the releases in this case are so broad as to remove all incentive for Defendants to manage risk, the rationale of *Spencer* controls here. Therefore, the Court finds that each of the exculpatory releases signed by Umali are void as contrary to public policy, insofar as they release Defendants from liability for negligence.

**Vermont Sports Injury Statute**

■ The Vermont sports injury statute states that a "person who takes part in any sport accepts as a matter of law the dangers therein, insofar as they are obvious and necessary." Vt. Stat. Ann. tit. 12, § 1037. Whether a risk is inherent, obvious and necessary to a sport is ordinarily an issue appropriate for a jury. *Dillworth v. Gambardella,* 970 F.2d 1113, 1117–18 (2d Cir.1992).

Defendants rely principally on *Nelson v. Snowridge, Inc.,* 818 F.Supp. 80 (D.Vt. 1993) and *Covel v. Mt. Mansfield Co., Inc.,* 237 A.D.2d 791, 655 N.Y.S.2d 154 (1997) in which both courts applied Section 1037 to grant summary judgment. Both cases involved consideration of whether weather conditions (i.e. ice and fog) were an obvious and necessary danger inherent to skiing. This case raises no issues involving the weather, or conditions that cannot reasonably be controlled by the operator. It instead involves the necessity and obviousness of the risk associated with a person-made racing course and "double jump."

Umali has proffered expert testimony that the dangerous condition of the track and jump was neither an obvious risk nor a necessary one. Umali has asserted that the jump was built in a way that made it too steep and sharp for beginners to navigate without the risk of injury. He contends that placing such a jump at the finish line was an unusual course configuration, one that posed a unique risk to beginners participating in the race. He further contends that this jump is not the typical finishing obstacle used by Defendants in designing their courses. Given this evidence, the Court cannot as a matter of ·law determine that this jump was an obvious and necessary danger of dual slalom bicycle racing. *See Hiibschman v. City of Valdez,* 821 P.2d 1354 (Alaska 1991) (summary judgment inappropriate where genuine issues of material fact existed as to whether the ski jump in question was an inherent risk of skiing or negligently created "... because it was built to where you got too much air ...").

**Conclusion**

Wherefore, for the reasons stated above, Umali's motion for summary judgment is **DENIED**.