2008 VT 15

**Shayne E. Thompson v. Hi Tech Motor Sports, Inc.**

[945 A.2d 368]

No. 06-523

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 8, 2008

*Wanda I. Otero-Ziegler* and *Frank Langrock* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiff-Appellee.

*John Paul Faignant* and *Antonin Robbason* of *Miller Faignant & Behrens, P.C.*, Rutland, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** After injuring herself during a test drive on one of defendant's motorcycles, plaintiff sued defendant for negligence. The trial court granted plaintiff partial summary judgment, concluding that the release plaintiff signed was contrary to public policy and therefore void as a matter of law. On interlocutory appeal, we conclude that the waiver is not void for public policy as a matter of law, but that the exculpatory clause does not release defendant for claims caused by its own negligence, and remand.

¶ 2. The following facts are undisputed for purposes of summary judgment. In May 2003, plaintiff went to defendant's motorcycle dealership to test drive a motorcycle. Plaintiff spoke with a salesperson and indicated that although she was a relatively new rider, she had a valid motorcycle driver's license and had experience riding a motorcycle with a 200cc engine. After further discussion with the salesperson, plaintiff signed a single-page release.[1] Then, as part of a group, plaintiff took a promotional test

---

[1] The release read, in relevant part:

> The undersigned hereby acknowledges that he/she has had prior experience with the operation of a motorcycle . . . , has a valid motor vehicle operator's license with a motorcycle endorsement . . . , and that he/she has examined the vehicle to be test driven, and is familiar with its operation. He/she understands that the operation of this vehicle is inherently dangerous. He/she understands that the operation of this vehicle may result in serious injury or even death and accepts these risks in test driving a Land-Air vehicle. . . .
>
> The undersigned waives any claim that he/she may have now or in the future against Land-Air, its employees, agents, officers, directors

ride on a 750cc motorcycle. During the test ride, as plaintiff was turning, she downshifted, but was unable to control the bike, and she hit a guardrail, injuring herself.

¶ 3. Plaintiff filed a suit for damages in superior court, claiming that defendant's agents were negligent in encouraging her to ride a bike that they knew or should have known was too big for plaintiff and that she could not operate safely. Defendant filed a motion for summary judgment, claiming that the release plaintiff signed discharged it as a matter of law from any liability for her injuries. Plaintiff filed a cross-motion for partial summary judgment, arguing that the release was contrary to public policy. The trial court resolved both motions on the same day in single-line orders. First, the court denied defendant's motion, concluding that there were "factual disputes concerning the representations made by the defendant's salesman." Second, the court granted plaintiff's motion for partial summary judgment, concluding simply that "defendant's release was void for being contrary to public policy." The trial court granted defendant permission to appeal, and this Court accepted review of the question of whether the release is void as contrary to public policy.

¶ 4. On appeal, we review summary judgment using the same standard as the trial court. *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 13, 178 Vt. 244, 882 A.2d 1177. Under that familiar standard, summary judgment is appropriate if there are no issues of material fact and a party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3); *Gallipo*, 2005 VT 83, ¶ 13. "In determining whether a genuine issue of fact exists, the nonmoving party receives the benefit of all reasonable doubts and inferences." *Samplid Enters., Inc. v. First Vt. Bank*, 165 Vt. 22, 25, 676 A.2d 774, 776 (1996).

¶ 5. Plaintiff's motion for partial summary judgment was based on two grounds: (1) the release was ambiguous and thus did not waive actions for defendant's negligence; and (2) the release was contrary to public policy, which encourages motorcycle safety. The trial court granted plaintiff's motion without discussion, so it is unclear which argument the court found compelling. On appeal, defendant addresses both of plaintiff's original claims and argues

and shareholders for injury to him/her self as a result of his/her operation or the operation by some other person of a motorized vehicle owned by or under the control of Land-Air.

that summary judgment was incorrect because the release (1) is unambiguous and includes suits based in negligence, and (2) does not interfere with any societal interest in motorcycle safety because societal expectations place responsibility for safe driving on the operator.

## I.

■ ¶ 6. First, we consider whether the release is void as contrary to public policy. As we have explained in the past, evaluating whether a release from liability contravenes public policy does not follow a strict formula because "no single formula will reach the relevant public policy issues in every factual context." *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 333, 670 A.2d 795, 798 (1995). Rather, we consider the totality of the circumstances and societal expectations to determine whether sufficient public interest exists to void a release. *Id.* at 334, 670 A.2d at 798. Although the public interest cannot be determined through a formulaic approach, some relevant characteristics of a public interest are the nature of the parties' relationship, including whether the party granting exculpation is in a position of dependency, and the type of service provided by the party seeking exculpation, including whether the service is laden with public interest. See Restatement (Third) of Torts: Apportionment of Liab. § 2 cmt. e (2000); see also *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 445-46 (Cal. 1963) (listing characteristics of contracts that affect a public interest).

■ ¶ 7. Although we recognize the great public need for motorcycle safety, we conclude that the waiver of liability in this case for injuries occurring on test drives does not contravene public policy. We are so persuaded given the nature of the service that defendant provides, the lack of control defendant exercises over those test-driving its vehicles, and the absence of legislative policy to regulate or control dealerships.

¶ 8. We agree with defendant that this case is distinguishable from *Dalury v. S-K-I, Ltd.*, wherein we concluded that a ski resort could not exculpate itself from negligence liability through a release. 164 Vt. at 335, 670 A.2d at 799. In *Dalury*, a skier sued a ski area where he fell and was injured, claiming that the premises was negligently designed. We concluded that the release was void because it contravened a strong tradition of public policy that placed the responsibility for proper maintenance of grounds

on those who own and control the property. *Id.* We reasoned that "if defendants were permitted to obtain broad waivers of their liability, an important incentive for ski areas to manage risk would be removed, with the public bearing the cost of the resulting injuries." *Id.* We concluded that "[i]t is illogical, in these circumstances, to undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control." *Id.*

¶ 9. The same concerns, which prompted our decision in *Dalury*, are not present here because whereas public policy places the burden of maintaining safe premises on a landowner, public policy concerning motorcycle safety places the burden of safe driving on the operator of the motorcycle. In *Dalury*, we emphasized that the defendant ski area had the unique opportunity and means "to foresee and control hazards" on its premises, thus it was logical for the ski area to bear the risk of a negligently designed or maintained ski area. In contrast, dealerships, like defendant, do not have the opportunity or means to control a prospective customer's driving capability. *Id.* Persons, who choose to take defendant's motorcycles out for a test ride, have the ability to undertake precautions to avoid hazards associated with operation, unlike skiers who "are not in a position to discover and correct risks of harm" on a ski hill. *Id.*

¶ 10. The dissent finds *Dalury* applicable, based on its conclusion that "[t]he property in this case may consist of motorcycles rather than ski trails, but the principles are no less applicable." *Post*, ¶ 25. This assertion ignores the fact that our decision in *Dalury* depended in large part on "[t]he major public policy implications . . . underlying the law of premises liability." 164 Vt. at 334, 670 A.2d at 799. *Dalury* emphasized the duty of care a business owner has "to make sure that its premises are in safe and suitable condition for its customers." *Id.* (quotation omitted). The dissent's attempt to equate motorcycles to ski hills fails because the strong public policy of premises liability in *Dalury* has no parallel in the area of motorcycle test riding. Another critical distinction is that there is no claim here that the product offered by defendant was in any way defective. The motorcycle operated well; it was driver error that caused the accident.

¶ 11. Furthermore, we conclude that in undertaking to retail motorcycles by providing test drives, defendant is neither "performing a service of great importance to the public, which is often

a matter of practical necessity for some members of the public," nor holding itself "out as willing to perform this service for any member of the public who seeks it." *Tunkl*, 383 P.2d at 445. Motorcycle dealerships do not provide a public service, which is a necessity for some members of the public. See *Jones v. Dressel*, 623 P.2d 370, 377 (Colo. 1981) (concluding that flight service for parachute jumping was not a matter of public interest); *Mann v. Wetter*, 785 P.2d 1064, 1066-67 (Or. Ct. App. 1989) (holding that diving school did not provide an essential public service); *Blide v. Rainier Mountaineering, Inc.*, 636 P.2d 492, 493 (Wash. Ct. App. 1981) (holding that mountaineering does not implicate the public interest). In addition, unlike the ski area in *Dalury* that advertised to and invited all members of the general public, even those with no experience, defendant made no representation that it was making its motorcycles available to all members of the public or that it was providing training in the proper use of motorcycles. Defendant allowed only those persons who attested in a signed release that they were properly licensed with a motorcycle endorsement and had sufficient relevant experience and training to take defendant's bikes for a test ride.

¶ 12. In reply, plaintiff argues that if the release is upheld, this will (1) provide a disincentive for dealers to conduct test rides safely; and (2) contravene legislative intent to promote motorcycle safety. We are not persuaded. First, rather than encouraging all persons to drive their vehicles, including those with no experience, defendant requires prospective drivers to attest, in the release, that they have "prior experience with operation" of the relevant vehicle, have a valid license with the relevant endorsement, have examined the vehicle and are familiar with the vehicle's operation. Furthermore, as explained above, during the test drive the prospective buyer, not the dealer, has control of the motorcycle. It is logical to place the incentive for safe driving on the party who has actual control of the vehicle.

¶ 13. Second, there is no existing public policy, as evidenced through legislative enactment, which strives to promote motorcycle safety through regulation either of motorcycle dealerships in general or their test-drive practices in particular. Although motorcycle safety is an important public concern and motorcycle use is highly regulated, the motorcycle-safety statutes focus on the driver's responsibilities to be properly trained, to follow correct driving techniques and to wear appropriate equipment. See 23

V.S.A. §§ 617 (requiring applicants for a motorcycle license to obtain a special motorcycle endorsement through an examination and skills test), 733 (authorizing the Department of Motor Vehicles to establish standards for motorcycle training programs), 1114 (listing proper riding positions), 1115 (listing methods of proper driving), 1256 (requiring riders to wear a helmet). Given this focus, we conclude that public policy, in general and as expressed through statute, does not prevent a motorcycle dealership from limiting its liability for injuries sustained during a test ride. See *Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 632 (Alaska 2001) (concluding that the release plaintiff signed to participate in an ATV safety class was not void for public policy in part because the legislature chose not to regulate ATV course operators in the same way as other industries); *Jones*, 623 P.2d at 377 (concluding that exculpatory contract the plaintiff signed before participating in a parachute jump was not void for public policy where commercial carrier safety regulations did not apply because it was a commercial flight); *Mann*, 785 P.2d at 1066 (holding that there were no public policy considerations to prevent a diving school from limiting liability for its own negligence).

¶ 14. Plaintiff also contends that case law supports her position, citing *Fortson v. McClellan*, 508 S.E.2d 549 (N.C. Ct. App. 1998). In *Fortson*, the North Carolina Court of Appeals concluded that a waiver signed in conjunction with a motorcycle safety course was void for public policy, explaining:

> Important public safety interests are present both in the instruction and use of motorcycles because both those receiving instruction in the proper use of motorcycles and the general traveling population are at risk from negligent training in the use of motorcycles. Trainees, unfamiliar with motorcycles, are particularly vulnerable to hazards associated with improper or negligent training.

*Id.* at 552. We find the present case readily distinguishable because *Fortson* focuses on the strong legislative policy of providing proper instruction during a motorcycle-safety class. As the court explained in *Fortson*, once the defendant "entered into the business of instructing the public in motorcycle safety, the defendant [could not], by contract, dispense with the duty to instruct with reasonable safety." *Id.* at 554. Even if we accepted that motorcycle instructors could not exculpate themselves from neg-

ligence liability, cf. *Petersen v. Sorensen*, 118 Wash. App. 1027, 2003 WL 22040908, at *5 (2003) (holding that motorcycle training course is not a matter of public necessity and release does not violate public policy), this situation is much different, and the policy concerns relevant in *Fortson* do not apply here. Defendant did not undertake to instruct plaintiff in proper motorcycle operation. In fact, defendant's release specified that plaintiff was already aware of how to safely operate a motorcycle. Allowing plaintiff to take a motorcycle for a test ride, after she attested that she had the relevant experience and training, does not implicate a public interest sufficient to void the release on public policy grounds.

¶ 15. The dissent advocates for adoption of a general rule that exculpatory agreements in the consumer context are always contrary to public policy. In support, the dissent cites the inherent disparity in bargaining power in consumer transactions, basic tort principles placing loss on the responsible party and a need to provide predictability in our decisions. We decline to adopt such a broad rule. The tort principles the dissent relies upon are not the only legal principles involved in this case. As another court observed, "[p]reinjury releases from liability for one's negligence pit two bedrock legal concepts against one another: the right to order one's relationship with another by contract and the obligation to answer in damages when one injures another by breaching a duty of care." *Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 6, 175 P.3d 560. While we agree that consistency is important, we are not convinced that "freedom to contract should always yield to the right to recover damages on the basis of another's fault." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 11, 171 P.3d 442. We reaffirm our rule that public policy issues are fact-dependent and "must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Dalury*, 164 Vt. at 334, 670 A.2d at 798 (quotation omitted). Disparity in bargaining power is a factor to be considered in this equation, but it is one element and this fact alone is not determinative, especially when the provided service is not essential in nature. See *Tunkl*, 383 P.2d at 445.

II.

¶ 16. Having concluded that the release is not void on its face for public policy reasons, we consider the scope of the release to

determine if it covers actions for defendant's ordinary negligence. See *Moore*, 36 P.3d at 633 (concluding that although release did not violate public policy, the scope of the release did not include liability for general negligence). Plaintiff concedes that she read and signed defendant's release, which states, in relevant part:

> The undersigned waives *any* claim that he/she may have now or in the future against Land-Air, its employees, agents, officers, directors and shareholders for injury to him/her self as a result of his/her operation or the operation by some other person of a motorized vehicle owned by or under the control of Land-Air.

(Emphasis added.) Although the release does not include the word negligence, defendant contends that the release unambiguously includes "any claim," and consequently applies to negligence claims as a matter of law. We disagree.

■■ ¶ 17. As with other contract provisions, we interpret those limiting tort liability based on the language of the writing, and where that language is clear, we must implement the intent and understanding of the parties. *Colgan v. Agway, Inc.*, 150 Vt. 373, 375, 553 A.2d 143, 145 (1988). At the same time, we have cautioned that contractual exclusions of negligence liability are traditionally disfavored, and thus their interpretation requires more exacting judicial scrutiny. *Id.* In applying this heightened judicial scrutiny, we strictly construe an exculpatory agreement against the party relying on it. *Id.* We have explained that "[t]he most effective way for parties to express an intention to release one party from liability flowing from that party's own negligence is to provide explicitly that claims based in negligence are included in the release." *Id.* at 376, 553 A.2d at 146. Although this language is not essential, in its absence there must be words that convey a similar intent. See *Douglass v. Skiing Standards, Inc.*, 142 Vt. 634, 637, 459 A.2d 97, 98 (1983) (concluding as a matter of law that the waiver the plaintiff signed to enter a skiing competition released the defendants from liability for negligence even though the agreement did not use the word "negligence").[2]

---

[2] We reach a different result than in *Douglass*, where we concluded that the release waived negligence claims even though it did not employ the word "negligence." 142 Vt. at 637, 459 A.2d at 98. The release in *Douglass* was more detailed, specifying that it was " 'to release, hold harmless and forever discharge

¶ 18. In *Colgan v. Agway, Inc.*, we concluded that a waiver in the parties' construction contract did not cover claims for the builder's negligence. 150 Vt. at 375, 553 A.2d at 145. Our decision was grounded on the wording and organization of the parties' contract. The exculpatory language the defendant relied on was embedded in a paragraph entitled "One Year Limited Warranty," and focused solely on liability for workmanship and materials. *Id.* at 377, 553 A.2d at 146. In addition, although the contract used particular language in other areas to describe the parties' respective obligations, the contract did not employ the word negligence. We concluded that "[g]iven the manner in which the remainder of the contract is drafted, it defies both logic and common sense that the parties would intend to release the seller from all liability arising out of defective design of the structure by tacking broad exculpatory language to the end of a limited warranty clause." *Id.*

¶ 19. Just as the organization of the parties' contract in *Colgan* persuaded us that it did not cover negligence claims, we conclude that this release does not exculpate defendant from liability arising out of its own negligence. Defendant correctly notes that the release contains broad language purporting to release any claim. The question is whether this general clause is specific enough to release defendant from liability, given that when a party wishes to exculpate itself from negligence liability "*a greater degree* of clarity is necessary to make the exculpatory clause effective than would be required for other types of contract provisions." *Id.* at 375, 553 A.2d at 145. The opening paragraph of the release recites that operating a motorcycle is inherently dangerous and that operation may result in injury. The release then waives "any claim" resulting from the operation. Based on this language, we conclude that the release waived claims for injuries resulting from dangers inherent to riding a motorcycle,

---

[defendants] from any and all claims, demands, liability, right or causes of action of whatsoever kind of [sic] nature which [plaintiff] may have, arising from or in any way connected with, any injuries, losses, damages, suffering . . . which' he might sustain." 142 Vt. at 637, 459 A.2d at 98 (alterations in original). Whereas, here, plaintiff agreed to waive "any claim that [she] may have now or in the future . . . for injury to [her]self as a result of [her] operation . . . of a motorized vehicle." The language in *Douglass* was much more specific in describing two key points: the types of claims — "all claims, demands, liability, right or causes of action of whatsoever kind" versus "any claim"; and the causal requirement for the injury — "in any way connected with" any injury versus resulting from plaintiff's operation in this case.

not for those resulting from defendant's negligence. Although plaintiff waived claims for injuries resulting from dangers inherent in riding a motorcycle, the release did not cover claims for injury resulting from defendant's alleged negligent representations to plaintiff. See *Sirek v. Fairfield Snowbowl, Inc.*, 800 P.2d 1291, 1295 (Ariz. Ct. App. 1990) (concluding that language in a release for ski rental alerted renter to "the dangers inherent in skiing," but did not alert renter that she was also releasing ski area for "its own negligence in selecting appropriate skis or properly setting the bindings"); *Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 2000) (holding that release that participant in scuba diving class signed waived claims associated with risks inherent in sport, but did not waive right to recover for instructor's failure to follow accepted safety standards).

¶ 20. This interpretation is supported by the Alaska Supreme Court's decision in *Moore v. Hartley Motors Inc.*, 36 P.3d at 633, which involved a similarly worded release. In *Moore*, the plaintiff signed a release before beginning an ATV instruction class. After noting that the release did not contain the word negligence, the court observed that the release's "opening sentences refer only to unavoidable and inherent risks of ATV riding, and nothing in its ensuing language suggests an intent to release [the defendants] from liability for acts of negligence unrelated to those inherent risks." 36 P.3d at 633. The court concluded that the plaintiff released the defendants "only from liability arising from the inherent risks of ATV riding and ordinary negligence associated with those inherent risks." *Id.*; see *Powell v. Am. Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 761 (Ind. Ct. App. 1998) (holding that exculpatory clause in release plaintiff signed as part of a health club membership agreement was not specific enough to release club from negligence liability); *O'Connell v. Walt Disney World Co.*, 413 So. 2d 444, 447 (Fla. Dist. Ct. App. 1982) (finding release not specific enough to bar recovery for injuries from amusement park's negligence during a horseback ride). But see *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 711-12 (Wyo. 1987) (holding that release unambiguously released defendants from negligence liability, even though the release did not include the word negligence because there was "no other rational purpose for which" the exculpatory language could have been intended). Similarly, we conclude that plaintiff released defendant from liability associated with the inherent dangers of

riding a motorcycle but did not release defendant from injuries caused by its own negligence.

*Remanded for further proceedings consistent with this opinion.*

¶ 21. **Johnson, J.**, concurring and dissenting. Although I concur in the majority's conclusion that the law forbids enforcement of the liability waiver in question, I disagree with its reasoning. To be sure, we have long held that provisions of this nature must be narrowly construed to ensure that they reflect the unmistakable intent of the parties, and this is ample and adequate protection in a commercial context where the parties generally enjoy equal bargaining strength. In a consumer transaction, however, the balance is invariably unequal; the seller controls the product or service, enjoys a decided advantage in knowledge and experience, and retains the opportunity and wherewithal to spread the risk of injury in the event of a mishap. In such circumstances, allowing the vendor to renounce its own negligence at the expense of the consumer threatens the principles that underlie our traditional tort system and, I would submit, the safety and welfare of the citizens of this state. Accordingly, contrary to the majority, I would hold that the waiver is contrary to public policy and therefore void and unenforceable.

¶ 22. It is commonplace today to observe, as Justice Holmes recognized more than a century ago, that the common law principles that courts develop and apply on a daily basis through the litigation process are "in fact at bottom the result of more or less definitely understood views of *public policy*." O.W. Holmes, Jr., *The Common Law* 32 (M. Howe ed. 1963) (emphasis added). The real challenge, of course, lies in deciding precisely *what* public policy — "the community common sense and common conscience," as this Court once described it — abides in any given case. *Payne v. Rozendaal*, 147 Vt. 488, 492, 520 A.2d 586, 588 (1986) (quotation omitted). For even while acknowledging the influence that "inherited instincts, traditional beliefs and acquired convictions" inevitably exert in the judicial process, Justice Cardozo — that other great common law jurist — also cautioned that courts must be "slow to substitute their own varying views of policy" for "settled institutions . . . and practices, which have taken root and flourished." *Messersmith v. Am. Fid. Co.*, 133 N.E. 432, 433 (N.Y. 1921); see B.N. Cardozo, *The Nature of the Judicial Process* 12-13 (1921); *Rothstein v. Snowbird Corp.*, 2007

UT 96, ¶ 10, 175 P.3d 560 (holding skier's waiver of ski area's own negligence void as against public policy, and noting the "protean" quality of public policy determinations and risk of inconsistent and subjective decisionmaking). The case before us offers a textbook illustration of the dilemma: how is a court to determine the social importance of a particular activity for purposes of voiding or upholding a vendor's contractual waiver of its own negligence without, consciously or unconsciously, importing subjective considerations relating to its own experience, sympathies, and values? Stated differently, how, in analyzing such provisions, can we achieve both of the fundamental goals of the common law: fairness to the parties, and stable and predictable rules of law to guide future cases?

¶ 23. We have set forth a number of factors in our earlier decisions to guide the public-policy determination, yet we have also stressed that "no single formula will reach the relevant public policy issues in every factual context" and that "what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 333-34, 670 A.2d 795, 798 (1995) (quotation omitted). Thus, the very malleability of the factors on which a court may focus guarantees, to some extent, the persistence of the problem. And the issue is no less acute in a decision to uphold a release than in one to strike it down. Here, for example, the majority concludes that public policy does not void a standard-form release that defendant motorcycle dealer required of plaintiff as a condition to test drive its vehicle. In so holding, the majority cites three basic considerations: the "nature of the service that defendant provides, the lack of control defendant exercises over those test-driving its vehicles, and the absence of legislative policy to regulate or control dealerships." *Ante*, ¶ 7. Yet, viewed from a slightly different perspective, these concerns can be seen to support precisely the opposite conclusion.

¶ 24. It is true, as the majority observes, that motorcycle dealers do not provide an essential public service. In *Dalury*, however, we specifically considered and rejected this requirement as applied to a ski resort, observing that the resort invited skiers of all levels of ability to buy lift tickets and ski its trails, and that "when a substantial number of such sales take place as a result of the seller's general invitation to the public to utilize the

facilities and services in question, a legitimate public interest arises." 164 Vt. at 334, 670 A.2d at 799. How is defendant here any different? Its business is selling motorcycles to the general public, and to this end, defendant obviously advertises and promotes its product. Indeed, although the facts here are not well developed, it appears to be undisputed that plaintiff responded to a publicly advertised promotional test ride of a particularly high-power model among defendant's motorcycles. The majority suggests that the promotion was quite restrictive because the form release that plaintiff was required to sign as a condition of participation provided that she "had prior experience with the operation of a motorcycle/ATV/watercraft," had a valid operator's license with a motorcycle endorsement, and was "familiar" with its operation. I would submit, however, that while these requirements may have narrowed somewhat the pool of consumers eligible for the test ride, the provisions still allowed the participation of thousands of potential riders with widely differing levels of "experience" and "familiarity" with the motorcycle in question.

¶ 25. The majority also focuses on the fact that, in *Dalury*, the defendant owned and controlled the property while here defendant could not "control a prospective customer's driving capability." *Ante*, ¶ 9. With respect, this argument appears to fundamentally confuse the issue. Although the consumer here is alleged to have been negligent herself, the question is whether the dealer may be absolved from liability for its own negligence, not the consumer's. In *Dalury*, we held that the defendants were in the best position to "foresee and control hazards" on its ski slopes, to "guard against the negligence of their agents and employees," and to "insure against risks." 164 Vt. at 335, 670 A.2d at 799. In addition, we noted that enforcing the waiver would remove "an important incentive" for risk management "with the public bearing the cost of the resulting injuries." *Id.* The property in this case may consist of motorcycles rather than ski trails, but the principles are no less applicable. Defendant owns and controls its motorcycles, and its knowledge and expertise allows it to "foresee and control" hazards arising from its *own* conduct. It is plainly in the best position to ensure that its salespersons are properly trained and instructed to avoid the negligent entrustment of one of its motorcycles to a person with insufficient skill and experience to control the vehicle, and to insure against the risk of injury in the event of negligence. Holding to the contrary removes the incentive

to exercise such care. Thus understood, these pertinent considerations militate against enforcement of the release in this case as contrary to the public interest.[3]

¶ 26. Indeed, viewed from a slighter broader perspective, one is left to wonder how, in its essentials, the situation here is any different from any other consumer transaction. If the defendant here had negligently repaired the motorcycle's brakes, resulting in injury to the plaintiff, a clearer release might well have withstood the majority's scrutiny, but surely its enforcement would represent a retreat from the policies that underlie our tort system. For "at bottom," as Holmes put it, we are a society committed to certain fundamental legal principles: compensation of innocent parties; placement of the loss on the parties responsible; and deterrence of wrongful conduct. See, e.g., *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 742 (Conn. 2005) (describing the fundamental purposes of our tort system). Therefore, when we *do* choose to abandon these policies, as Justice Tobriner observed, "it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 447 (Cal. 1963).

¶ 27. Viewed through the prism of these bedrock principles, nearly all of our decisions in this area may thus be seen as focusing less on the nature of the particular activity at issue than on the essential status and relationship of the participants. Where we have upheld hold-harmless clauses it has generally been in the context of arms-length transactions between commercial parties of relatively equal bargaining strength. See *Hart v. Amour*, 172 Vt. 588, 590, 776 A.2d 420, 424 (2001) (mem.) (upholding hold-harmless indemnification agreement where it "represent[ed] an arms-length commercial transaction between a business and a commercial lessor"); *Hamelin v. Simpson Paper Co.*, 167 Vt. 17, 21, 702 A.2d 86, 89 (1997) (upholding hold-harmless clause in commercial contract to provide professional security services where the contract "reflect[ed] an arms-length business deal" dividing the risks and responsibilities); *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 437-38, 658 A.2d 31, 34 (1995)

---

[3] The motor vehicle statutes cited by the majority may focus on the driver's responsibility to drive safely, but they do not in any way undermine defendant's separate and concurrent duty to exercise care in the control of its product.

(upholding contractual waiver of personal injury claims in commercial lease between landlord and business lessee); *Furlon v. Haystack Mountain Ski Area, Inc.*, 136 Vt. 266, 270, 388 A.2d 403, 405 (1978) (upholding contractual assumption-of-risk clause between ski resort and ski lift manufacturer). While acknowledging that such provisions are generally disfavored, we have held that public policy concerns are not the predominant concern absent a disparity in contractual bargaining power between the parties. See, e.g., *Hart*, 172 Vt. at 590, 776 A.2d at 424 (finding no public-policy bar to the enforcement of a hold-harmless clause absent evidence "that there was any disparity in bargaining power between these commercial parties"); *Hamelin*, 167 Vt. at 21, 702 A.2d at 89 (noting that "[t]he considerations of public policy that motivated us in *Dalury*, such as unequal bargaining power, fairness, and the benefits of risk-spreading, are not present here."); *Furlon*, 136 Vt. at 269, 388 A.2d at 405 (observing that our decision was "not here moved by . . . considerations of public policy" absent a "disparity in bargaining power" between the parties). In the commercial context, simply ensuring that the waiver in question was of sufficient clarity to reflect the unmistakable intent of the parties serves as a sufficient safeguard.

¶ 28. In contrast, those decisions where a waiver has been held to contravene public policy have invariably involved consumer transactions in which the defendant vendor is better positioned to foresee and guard against the risks attendant upon its product or service than the purchaser, and considerations of "unequal bargaining power, fairness, and the benefits of risk-spreading" militate against absolving the defendant of its own negligence at the expense of the relatively innocent consumer. *Hamelin*, 167 Vt. at 21, 702 A.2d at 89. It is a short step from this perception to a recognition that these same policy concerns inhere in virtually *every* consumer transaction, and thus should operate as a bar to enforcement regardless of the particular nature of the business. A comprehensive holding to this effect would further serve the public interest by replacing the inherent uncertainty of the current case-by-case approach, discussed earlier, with a uniform and predictable rule of law. Of course, there may be cases where the consumer is negligent, having voluntarily engaged in conduct that was unreasonable in light of his or her own knowledge or experience, as defendant here has alleged. But this does not warrant a policy of allowing the vendor to avoid virtually all

responsibility for its *own* misconduct, where its control of the product and attendant risks could have prevented the harm altogether.

¶ 29. In voiding all contractual releases from liability for personal injury in all cases the Supreme Court of Virginia has stated that to permit one contracting party to put the other "at the mercy of its own misconduct . . . can never be lawfully done where an enlightened system of jurisprudence prevails. Public policy forbids it . . . ." *Hiett v. Lake Barcroft Cmty. Ass'n*, 418 S.E.2d 894, 896 (Va. 1992) (quotation omitted) (quoted in *Dalury*, 164 Vt. at 333, 670 A.2d at 798). We need not go so far as the Virginia court to recognize that, in the consumer context at least, such provisions should not be enforced under "an enlightened system of jurisprudence." I would hold, therefore, that the release in this case was contrary to the fundamental public policy of Vermont, and affirm the judgment on that basis.