2009 VT 29

### Clint Provoncha and Heidi Provoncha v. Vermont Motocross Association, Inc. and David Driver

[974 A.2d 1261]

No. 08-168

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 13, 2009

*Claude T. Buttrey* and *Eric G. Derry*, Law Clerk (On the Brief) of *Schuster, Buttrey & Wing, P.A.*, Lebanon, New Hampshire, for Plaintiffs-Appellants/Cross-Appellees.

*Marsha Smith Meekins* of *Marsha Smith Meekins, LLC*, South Burlington, for Defendants-Appellees/Cross-Appellants.

¶ 1. **Skoglund, J.** Heidi and Clint Provoncha appeal from the Orleans County Superior Court's grant of summary judgment in favor of Vermont Motocross Association (VMA) and David Driver. VMA and Driver cross-appeal one of the court's evidentiary rulings. The Provonchas filed suit alleging negligence in connection with injuries Mr. Provoncha sustained while participating in a motocross event sponsored by VMA and conducted on property owned and maintained by David and Lucille Driver. The superior court ruled that the "Race Day Entry Form," which Mr. Provoncha signed the day before the event, operated as a waiver of the negligence claim. We affirm the superior court's grant of summary judgment and do not reach VMA and Driver's cross-appeal.

¶ 2. The relevant facts, viewed in the light most favorable to the Provonchas, are as follows. VMA is a Vermont 501(c)(3) corporation that sponsors motocross races for its members. It leases the Rider Hill facility, consisting of approximately fifteen acres in Derby, Vermont, from the Drivers. VMA has approximately 300 individual members, and, although VMA is the only association of its kind in Vermont, there are dozens of associations in New England that offer comparable events. Only members who hold a current VMA membership are permitted to race at scheduled VMA events. Mr. Provoncha has been a VMA member and racer for more than ten — albeit nonconsecutive — years.

¶ 3. Rider Hill racecourse features "flagging stations" in which flaggers are instructed to display caution flags in the event of an accident to make other riders approaching the area aware of the additional danger to themselves and others. Prior to the date of his accident, Mr. Provoncha had formed the opinion that the flagging at Rider Hill was inadequate. His opinion was based on his claims that VMA used young people as flaggers, and used

incompetent flaggers who were not alert or looking in the right direction, or who didn't display flags promptly when riders fell off their motorcycles. Notwithstanding his belief that the inadequate flagging increased the risk of injury to participants, Mr. Provoncha continued to race at Rider Hill.

¶ 4. This case arose out of an accident that occurred at a VMA event held at the Rider Hill racecourse on July 7, 2002. During pre-race warm-ups for the "expert class" event, Mr. Provoncha was ahead of the other riders when he lost control of his motorcycle on a jump and fell off his bike. As he was getting up to get out of the way, another motorcycle came over the jump and struck him. As a result of this accident, Mr. Provoncha suffered serious physical injury which has rendered him paraplegic. At the time of Mr. Provoncha's accident, there was a flagging station immediately adjacent to the jump that was manned by a young person. No warning flag was raised after Mr. Provoncha fell in order to alert other riders behind him that he was down.

¶ 5. Prior to or on the date of the accident, the Provonchas signed three documents purporting to release VMA and Driver from liability. On June 16, 2002, Mr. Provoncha signed a "VMA Membership Form"; on July 6, 2002, Mr. Provoncha signed a "Race Day Entry Form"; and on July 7 — the day of the accident — Ms. Provoncha signed a "Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement" (Release and Waiver Agreement).

¶ 6. It is the Race Day Entry Form that answers the question before us. The one-page form includes spaces for the name of the race participant, the date and class of the event, and the make, model, and size of the motorcycle to be driven. Immediately below that portion of the form, the only full paragraph on the form reads as follows:

> I _____, Release and agree to hold harmless the Vermont Motocross Association Inc. RiderHill Race Track, The promoters, The owners and leases of the premises, The participants, The officers, Directors, officials, representatives, agents, and employees of all of them, of and from liability, loss, claims, and demands that may accrue from any loss, damage or injury, including paralization and/or death to my person or property, in anyway arising while engaged in competition or in practice or preparation

therefore, or while entering or departing the premises, from any cause what so ever. I know the risk and danger to myself and my property while upon said premises or while participating or assisting in this event. I voluntarily, in reliance upon my own judgment and ability, hereby assume all the risk for loss, damage, injury including paralization and/or death to myself and my property from any cause.

(Mistakes in original.)

¶ 7. On June 29, 2005, the Provonchas filed a negligence suit, naming VMA and Driver as defendants. The Provonchas claimed that VMA and Driver negligently caused Mr. Provoncha's injuries by failing to hire, train, and supervise appropriate flag persons, or to otherwise take reasonable measures to protect fallen riders from being struck by other riders. The Provonchas also argued that VMA and Driver negligently failed to provide prompt medical services to Mr. Provoncha after he was injured.

¶ 8. VMA and Driver moved for judgment as a matter of law under Vermont Rule of Civil Procedure 50, arguing that the documents signed by the Provonchas released them from liability for negligence. The Provonchas opposed the motion. The court evaluated each of the three documents, and concluded that while neither the VMA Membership Form nor the Release and Waiver Agreement released VMA and Driver from liability for negligence, the Race Day Entry Form was effective for that purpose. Treating the Rule 50 motion as one for summary judgment, the court granted summary judgment in favor of VMA and Driver. This appeal and cross-appeal followed.

¶ 9. The Provonchas contend on appeal that the Race Day Entry Form does not release VMA and Driver from liability because: (1) it is not sufficiently clear as required by our decision in *Thompson v. Hi Tech Motor Sports, Inc.*, 2008 VT 15, 183 Vt. 218, 945 A.2d 368; and (2) it violates public policy.

¶ 10. VMA and Driver cross-appeal, challenging one of the trial court's evidentiary rulings regarding expert testimony; they do not challenge the trial court's rulings regarding the VMA Membership Form or the Release and Waiver Agreement. Consequently, the efficacy of those forms in releasing VMA and Driver from liability is a question not before us.

¶ 11. We review grants of summary judgment de novo, using the same standard as the trial court. *State v. Great Ne. Prods., Inc.*,

2008 VT 13, ¶ 5, 183 Vt. 579, 945 A.2d 897 (mem.). Summary judgment is appropriate when the moving party has demonstrated that there are no issues of material fact and that it is entitled to judgment as a matter of law. *Id.*; see also V.R.C.P. 56(c). "In determining whether a genuine issue of fact exists, the nonmoving party receives the benefit of all reasonable doubts and inferences." *Thompson*, 2008 VT 15, ¶ 4 (quotation omitted). The Provonchas' complaint alleges only negligence; therefore, if the Race Day Entry Form releases VMA and Driver from liability for negligence, the grant of summary judgment was appropriate.

■ ¶ 12. Generally speaking, exculpatory contracts are disfavored, and are subject to close judicial scrutiny; to be effective, such contracts must meet higher standards for clarity than other agreements, and must pass inspection for negative public policy implications. Restatement (Third) of Torts, Apportionment of Liability § 2 cmts. d, e (2000). Our decisions have been consistent with these general rules.

■ ¶ 13. The question of whether the Race Day Entry Form at issue in this case was sufficiently clear to release VMA and Driver from liability for negligence is governed by *Douglass v. Skiing Standards, Inc.*, 142 Vt. 634, 459 A.2d 97 (1983). In *Douglass*, we held that a document purporting to release a ski area from liability to a professional freestyle skier was sufficiently clear for purposes of exculpating it from negligence liability notwithstanding its failure to include the word "negligence" in its terms. *Id.* at 637, 459 A.2d at 99. We summarized the *Douglass* release as follows:

> [I agree] "to release, hold harmless and forever discharge [defendants] from any and all claims, demands, liability, right or causes of action of whatsoever kind of [sic] nature which [I] may have, arising from or in any way connected with, any injuries, losses, damages, suffering . . . which" [I] might sustain as a result of [my] participation in the competition. . . . [I] acknowledge[] that the agreement constitute[s] a binding promise . . . "to fully discharge [defendants] from any and all injuries or loss resulting from [my] participation."

*Id.* at 637, 459 A.2d at 98-99. We recently reaffirmed *Douglass* in *Thompson v. Hi Tech Motorsports, Inc.*, reasoning that the

*Douglass* release "was much more specific [than the *Thompson* release] in describing two key points: the types of claims — 'all claims, demands, liability, right or causes of action of whatsoever kind' versus 'any claim'; and the causal requirement for the injury — 'in any way connected with' any injury versus resulting from . . . operation" of a motor vehicle. 2008 VT 15, ¶ 17 n.2. The Race Day Entry Form is indistinguishable from the release at issue in *Douglass*. Like the *Douglass* release, the form is comprehensive as to type of claim — "liability, loss, claims, and demands that may accrue from any loss, damage or injury." And, in fact, the causal nexus for the injury — "in anyway arising . . . from any cause what so ever" even more naturally includes negligence than *Douglass*'s "in any way connected with" language. The Race Day Entry Form is thus sufficiently clear as to operate as a release of negligence claims against defendants.

¶ 14. The public policy inquiry also counsels in favor of upholding the release. Recently, in *Thompson*, we reaffirmed our commitment to the dual clarity/public-policy inquiry by "strictly constru[ing] an exculpatory agreement against the party relying on it," and "consider[ing] whether [a] release [was] void as contrary to public policy." 2008 VT 15, ¶¶ 17, 6. In *Thompson*, we held that an agreement releasing a motorcycle dealership from "any claim"* was insufficiently clear to exclupate it from its own negligent acts and omissions relating to a person test-driving its vehicles. *Id.* ¶ 16. We concluded, however, that the agreement was consistent with public policy. *Id.* ¶ 7.

¶ 15. We explained in *Thompson* that "evaluating whether a release from liability contravenes public policy does not follow a strict formula because no single formula will reach the relevant public policy issues in every factual context." *Id.* ¶ 6 (quotation omitted). "Rather," we continued, "we consider the totality of the circumstances and societal expectations to determine whether sufficient public interest exists to avoid a release." *Id.* We conclude, given the totality of the circumstances of this case, the nature of the activity, and the expectations of society, that there

---

* In relevant part, the release at issue in *Thompson* read: "The undersigned waives any claim that he/she may have now or in the future against [defendant] . . . for injury to him/her self as a result of his/her operation . . . of a motorized vehicle owned by . . . [defendant]." 2008 VT 15, ¶ 2 n.1.

are no public policy barriers to effectuating the Race Day Entry Form.

■ ¶ 16. Our first foray into the question of whether a release was void as a violation of public policy was in *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 670 A.2d 795 (1995). In *Dalury*, we evaluated a release purporting to exculpate a ski resort from negligence liability to a recreational skier who was injured when he collided with a metal pole that formed part of the control maze for a ski lift line. We cited favorably the extensive list of factors considered by the California Supreme Court in *Tunkl v. Regents of University of California*, 383 P.2d 441 (1963). According to the *Tunkl* court, an agreement that exhibits some or all of the following characteristics is invalid:

"1. It concerns a business of a type generally thought suitable for public regulation. 2. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. 3. The party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. 4. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks the party's services. 5. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. 6. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or the seller's agents."

*Dalury*, 164 Vt. at 332, 670 A.2d at 797-98 (quoting *Tunkl*, 383 P.2d at 445-46). We noted that these were "relevant considerations, but not . . . rigid factors." *Id.* at 333, 670 A.2d at 798.

¶ 17. In *Dalury*, picking up on *Tunkl*'s second and third factors, we noted that ski resorts do not provide an essential public service, but that they are open to the public, and that thousands

of recreational skiers buy lift tickets every day during the season. *Id.* at 334, 670 A.2d at 799. We reasoned that while "[e]ach ticket sale may be, for some purposes, a purely private transaction," nevertheless, "when a substantial number of such sales take place as a result of the seller's general invitation to the public to utilize the facilities and services in question, a legitimate public interest arises." *Id.* We also reasoned that the public policy implications of releasing ski resorts from liability were "those underlying the law of premises liability." *Id.* We stressed that ski resorts rather than recreational skiers have the opportunity to properly inspect and foresee hazards on their premises. *Id.* at 335, 670 A.2d at 799. On these bases, we held that the exculpatory agreement at issue in *Dalury* was void as contrary to public policy.

¶ 18. Later, in *Spencer v. Killington, Ltd.*, we held that our reasoning in *Dalury* applied "with equal force" to a release purporting to excuse a ski area from liability in connection with a recreational race series. 167 Vt. 137, 142, 702 A.2d 35, 37 (1997). In *Spencer*, an amateur ski racer was injured when he struck a wooden post marking the finish line of the race course. We noted that "the recreational race series . . . was open to the general public, particularly persons with limited or no experience in competitive skiing; indeed, skiers with collegiate or professional racing experience were barred from the races." *Id.* Consistent with our *Dalury* analysis, we also reasoned that it was the ski area, and not the recreational skier, who had the opportunity to inspect and foresee premises hazards. *Id.*

¶ 19. In *Thompson*, we held that there were no public-policy barriers to effectuating an exculpatory agreement releasing a motorcycle dealership from liability to a customer who injured herself on a test drive. 2008 VT 15, ¶ 7. We reasoned that "[a]lthough the public interest cannot be determined through a formulaic approach, some relevant characteristics of a public interest are the nature of the parties' relationship, including whether the party granting exculpation is in a position of dependency, and the type of service provided by the party seeking exculpation, including whether the service is laden with public interest." *Id.* ¶ 6. We reasoned that, unlike in the ski-resort premises liability context, see *Dalury*, 164 Vt. at 335, 670 A.2d at 799, the release did not implicate the "strong tradition of public policy that place[s] the responsibility for proper maintenance of grounds on those who own and control the property." *Thompson*,

2008 VT 15, ¶ 8. "[W]hereas public policy places the burden of maintaining safe premises on a landowner," we continued, "public policy concerning motorcycle safety places the burden of safe driving on the operator of the motorcycle." *Id.* ¶ 9. Inquiring into the type of service involved, we returned to the second and third *Tunkl* factors and reasoned that the dealership was neither "'performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public,' nor holding itself 'out as willing to perform this service for any member of the public who seeks it.'" *Id.* ¶ 11 (quoting *Tunkl*, 383 P.2d at 445).

■ ¶ 20. While it is arguably true that the public policies underlying both premises liability and the safe operation of motorcycles are implicated on the facts of this case, we have no difficulty in determining that the service VMA and Driver provide is neither of great importance to the public nor open to the public at large. See *Grbac v. Reading Fair Co.*, 521 F. Supp. 1351, 1355 (W.D. Pa. 1981) (reasoning that stock car racing does not implicate the public interest); *Jones v. Dressel*, 623 P.2d 370, 377 (Colo. 1981) (en banc) (concluding that flight service for parachute jumping was not a matter of public interest); *Mann v. Wetter*, 785 P.2d 1064, 1066-67 (Or. Ct. App. 1990) (en banc) (holding that diving school did not provide an essential public service); *Blide v. Rainier Mountaineering, Inc.*, 636 P.2d 492, 493 (Wash. Ct. App. 1981) (holding that mountaineering does not implicate the public interest). Unlike in the ski-resort cases, VMA does not permit the public at large to race in its scheduled events; only current VMA members are free to do so. Nor does the sheer quantity of VMA participants convert this private activity to a matter of legitimate public interest; VMA's membership is a mere 300 persons strong. Accordingly, we hold that the release at issue in this case is not void as contrary to public policy. Cf. *Grbac*, 521 F. Supp. at 1355 (holding that a release in an agreement concerning participation in a stock-car race does not contravene public policy); *Jones*, 623 P.2d at 377 (concluding that the exculpatory contract the plaintiff signed before participating in a parachute jump was not void for public policy); *Mann*, 785 P.2d at 1066 (holding that there were no public policy considerations to prevent a diving school from limiting liability for its own negligence); *Blide*, 636 P.2d at 493

(holding that the release the plaintiff executed before climbing Mount Rainier was not void for public policy).

*Affirmed.*

¶ 21. **Johnson, J.,** dissenting. I dissent for the simple and obvious reason that this case is plainly controlled by *Thompson v. Hi Tech Motor Sports, Inc.*, 2008 VT 15, 183 Vt. 218, 945 A.2d 368, where we held that a similar contractual release was insufficiently clear and unambiguous to insulate the defendant from liability for its own negligence. In holding to the contrary, the majority mistakenly concludes that *Thompson* was based on slight differences in phrasing between the release at issue there, which waived "any claim," and the release that we found to be effective in *Douglass v. Skiing Standards, Inc.*, 142 Vt. 634, 637, 459 A.2d 97, 98 (1983), which waived "any and all claims, demands, liability, right or causes of action of whatsoever kind." Although we noted these textual variations in a footnote in *Thompson*, 2008 VT 15, ¶ 17 n.2, this was not the basis of our holding. Indeed, we acknowledged in our opinion that the release at issue was quite comprehensive and "contain[ed] broad language purporting to release any claim." *Id.* ¶ 19.

¶ 22. The problem with the release in *Thompson* was not its language, but its context, or as we phrased it there its "organization." *Id.* As we explained:

> The opening paragraph of the release recites that operating a motorcycle is inherently dangerous and that operation may result in injury. The release then waives "any claim" resulting from the operation. Based on this language, we conclude that the release waived claims for injuries resulting from dangers *inherent* to riding a motorcycle, not for those resulting from defendant's *negligence.*

*Id.* (emphasis added). Accordingly, we concluded that the release did not bar the plaintiff's negligence claim, and remanded for further proceedings. *Id.* ¶¶ 1, 20.

¶ 23. In so holding, we relied on a number of cases from other jurisdictions that reached similar conclusions. See, e.g., *Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 633, 632 n.26 (Alaska 2001) (release whose "opening sentences refer only to unavoidable and inherent risks of ATV riding" followed by general release "from

any and all liability, loss, damage claim or cause of action . . . arising out of participation in the ATV RiderCourse" released defendant only from the inherent risks of ATV riding); *Sirek v. Fairfield Snowbowl, Inc.*, 800 P.2d 1291, 1295 (Ariz. Ct. App. 1990) (although release alerted plaintiff "to the dangers inherent in skiing" it did not alert plaintiff that defendant was "released from its own negligence"); *O'Connell v. Walt Disney World Co.*, 413 So. 2d 444, 445 n.2, 447 (Fla. Dist. Ct. App. 1982) (release that purported to assume "risks inherent in horseback riding" followed by waiver of "any claims or causes of action . . . arising out of any injuries [the participant] may sustain as a result of that horseback riding" did not relieve defendant from liability for its own negligence).

¶ 24. Although not cited in *Thompson*, another instructive decision consistent with its holding is *Steele v. Mt. Hood Meadows Oregon, Ltd.*, 974 P.2d 794 (Or. Ct. App. 1999). There, a ski operator's form release opened with a provision stating that the ticket purchaser assumed the "inherent risks of skiing" followed by a general release of "any claims for personal injury . . . arising in connection with or resulting from" the use of the facility. *Id.* at 795. Although the latter provision was seemingly broad and all-encompassing, the Oregon court concluded that the two provisions, read together, were ambiguous, and that a ticket holder "reasonably could have understood that he or she was only releasing any claims for personal injury that resulted from those inherent risks," not from the ski operator's negligence. *Id.* at 798.

¶ 25. The provision in the Race Day Entry Form signed by Mr. Provoncha in this case contains the same basic ambiguity identified in *Thompson* and the decisions cited above. The first sentence purports to broadly release defendant from "liability, loss, claims, and demands . . . in anyway arising while engaged in competition . . . [or] from any cause what so ever." This is followed immediately — and at least arguably modified by — two additional sentences plainly referring to the risks inherent in the sport, the first acknowledging "the risk and danger to myself . . . [of] participating or assisting in this event" and the second assuming "in reliance upon my own judgment ability" the risk of loss. The ambiguity occasioned by these provisions appearing within the *same* document was compounded, in this case, by the fact that Mr. Provoncha had already signed *another* document (a VMA Membership Form) several weeks before the race which

appeared, at best, to state that he assumed responsibility for the risks inherent in the sport but made no mention of defendants' own negligence. Indeed, the trial court here found, and defendants have not disputed, that this first form merely "release[d] the Defendants from claims for injuries resulting from dangers inherent to riding a motorcycle" and did "not clearly establish the parties' intention to release the Defendants from liability arising out of the Defendants' own negligence."

¶ 26. As we held in *Colgan v. Agway, Inc.*, 150 Vt. 373, 553 A.2d 143 (1988), and reaffirmed in *Thompson*, releases of this nature are held to a heightened standard, and must clearly and unambiguously express the parties' intention to absolve a party from responsibility for its own negligence. See *Colgan*, 150 Vt. at 375, 553 A.2d at 145 (noting that courts have "traditionally disfavored contractual exclusions of negligence liability, and . . . have applied more exacting judicial scrutiny when interpreting this type of contractual provision"); *Thompson*, 2008 VT 15, ¶ 19 (observing that "when a party wishes to exculpate itself from negligence liability 'a *greater degree* of clarity is necessary to make the exculpatory clause effective' ") (quoting *Colgan*, 150 Vt. at 375, 553 A.2d at 145). Such provisions "must be construed strictly against the parties relying on them." *Colgan*, 150 Vt. at 375, 553 A.2d at 145.

¶ 27. Contrary to the majority, I cannot see how the form release at issue here — viewed in its entirety and measured against these exacting standards — can be construed as a clear and unambiguous exculpation of defendants from liability for their own negligence. As in *Thompson*, I would hold that, at most, the release waived claims for injuries resulting from risks inherent in motocross racing, not those resulting from defendants' negligence. Accordingly, as in *Thompson*, I would reverse the judgment, and remand for further proceedings to determine whether the conduct that allegedly resulted in Mr. Provoncha's injuries represented a risk within the limited scope of the release.